USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2067 UNITED STATES, Appellee, v. PAUL LODER, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Walter Jay Skinner, Senior U.S. District Judge] __________________________ ____________________ Before Boudin, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Pettine,* Senior District Judge. _____________________ ____________________ Charles W. Rankin with whom Rankin & Sultan was on brief for __________________ ________________ appellant. James F. Lang, Assistant United States Attorney, with whom Donald _____________ ______ K. Stern, United States Attorney, was on brief for appellee. ________ ____________________ May 11, 1994 ____________________ _____________________ *Of the District of Rhode Island, sitting by designation. PETTINE, Senior District Judge. _____________________ Defendant Paul Loder appeals his conviction for aiding and abetting mail fraud in violation of 18 U.S.C. 2 and 1341. He asserts that the trial court erred in denying his Motion for a Judgment of Acquittal in that the government presented insufficient evidence at trial to prove that he aided and abetted mail fraud. Furthermore, he asserts that the trial judge erred in admitting into evidence under Rule 801(d)(1)(B) certain conversations between a government witness and another party. We REVERSE the conviction, finding the evidence insufficient. Therefore, we do not reach the Rule 801(d)(1)(B) issue. I. __ In September of 1987, David Morrison, who at the time resided in a halfway house in Roxbury, Massachusetts, contacted his brother, James Morrison, a captain in the Boston Fire Department. David wished to purchase a new car, but was unable to obtain credit, so he asked James to purchase and register the car in his own name, using money supplied by David both for the down payment and for all subsequent car payments. James agreed, and purchased the car, a 1987 Chevrolet Caprice ["the Caprice" or "the car"], in the manner outlined. General Motors Acceptance -2- 2 Corporation ("GMAC") financed the purchase, and the car was insured, in James Morrison's name, through Aetna Insurance Company ("Aetna"). David Morrison took possession of the car. One night in the following month, October 1987, James Morrison was at work at a firehouse on Oliver Street in Boston. His brother, David Morrison, appeared at the firehouse in an intoxicated condition, and informed him that something had happened to the car, that it was in the middle of an intersection close to the firehouse, and that it "won't go." [Tr. 2: 129] James went to look at the car, realized that the frame appeared to be broken, and had it towed to a lot beside the firehouse. A few days later, David again visited James at the firehouse, and later on the same day the brothers communicated by telephone. On the following day, a tow truck showed up at the firehouse, the driver asking for James Morrison. James provided him with the keys to the Caprice, after which the driver towed the car away. A day later, James Morrison reported to the Boston Police that the car had been stolen from outside the firehouse on Oliver Street. He also filed an insurance claim with Aetna, again claiming that the car had been -3- 3 stolen. Aetna allowed the claim and issued two checks dated December 12, 1987. Both checks were sent by mail to the designated payees, the first in the amount of $14,545.05 to GMAC (the basis of Count 3 of the indictment) and the second in the amount of $1,750.95 to James Morrison (the basis of Count 4 of the indictment). The story now shifts to a United States government facility in Watertown, Massachusetts, where the Chevrolet Caprice next appeared. This facility was run by the General Services Administration ("GSA") and consisted of a large field and a number of warehouses. GSA operated a firing range at the Watertown facility which was used by a number of federal law enforcement agencies and which was staffed by Justin Gleason, a Federal Protective Services ("FPS") Sergeant. The warehouses were used by several federal agencies (IRS, DEA, Customs, GSA), primarily for storage. Some space at the Watertown facility was leased to private companies, among them Warner Brothers, which used the space to store vehicles used in the filming of the television series Spenser for Hire ("SFH"). Pursuant to lease agreements with GSA, Warner Brothers rented Building 236 from October 1985 through June 1987; upon the expiration of the lease GSA informally extended the tenancy until November -4- 4 1987. Building 236 was used by the SFH special effects and transportation crews. The transportation crew, which transported cars, trucks, and trailers between Building 236 and filming locations around the Boston area, was comprised of members of Local 25 of the Teamsters Union. These members included defendant Paul Loder, who worked as a driver, and his co-defendant, Richard Murray, who worked as a "co-captain" of the transportation crew. Murray also owned Star Auto Parts in Somerville, Massachusetts, a company that was licensed to buy and sell auto parts and to operate a junkyard, and, prior to the events of this case, Loder had worked there for Murray. Another of the buildings at the Watertown facility, Building 234, contained a fenced off space where a number of new FPS police vehicles were being stored. Justin Gleason,1 the FPS Sergeant who staffed the firing range, ____________________ 1Justin Gleason was indicted for two counts of receiving unlawful gratuities in return for overlooking unlawful activities at the Watertown facility. He was charged with receiving the use of two Ford cars, a 1987 Thunderbird and a 1988 Country Squire Wagon, that had been furnished to SFH by Ford Motor Company for filming purposes. These cars had been subject to water damage so, although they appeared to be in excellent condition, Ford would not sell or warranty them and instead furnished them to SFH to be used for special effects purposes. In September of 1990, a jury returned a guilty verdict against Gleason on these two counts of receiving gratuities. At his sentencing hearing, Gleason agreed to cooperate with the government in return -5- 5 testified that in the fall of 1987 he became aware that a 1987 Chevrolet Caprice was parked among the FPS vehicles. Running a Vehicle Identification Number ("VIN") check, he learned that the Caprice was registered to Morrison. Asking Murray about the car, Gleason was informed that Murray "had been roped into something that he can't get out of and he was going to get rid of it." [Tr. 2:193] In this conversation and subsequent conversations, Gleason asked Murray repeatedly to remove the car from Building 234. In one of these conversations, Murray told Gleason that the car was registered to "a high official, the captain of a fire department," and that the car was in a damaged condition because "somebody got drunk and ran over a Jersey barrier." [Tr. 2:194] Gleason also testified to having a conversation with Loder about the Chevrolet Caprice, in which Loder said that he was helping Murray get rid of the car and that he ____________________ for a recommendation by the government that he be sentenced to probation only. He did in fact receive a sentence of probation. Gleason testified before the grand jury and at trial as an immunized witness. At trial, the information as to Gleason's guilty verdict, sentencing, and immunization was presented to the jury on direct examination. This gave rise to defendant's second claim on appeal, that the lower court erred in permitting the government to introduce prior consistent statements of Gleason to Adams because it was the government, not the defendant, who first raised the issue of Gleason's credibility in its opening statement and in direct examination of Gleason. Because we grant defendant's motion for acquittal, we do not reach this second issue. -6- 6 had "taken the plate off for insurance." [Tr. 2:195] Finally, Gleason testified that, when he went to the Watertown facility one weekend, he discovered the front gate open. He went to Building 234 and there he saw Murray and a second individual whose face was obscured by a welder's mask cutting the top off the Caprice. He again told Murray to get the car out of the building, and when he returned later the Caprice was gone. On November 5, 1987, during the course of an investigation into the activities at the Watertown facility, FPS Criminal Investigator William Adams noticed two vehicles in that area that did not belong to FPS -- a vehicle belonging to Justin Gleason, and the Chevrolet Caprice registered to James Morrison. Adams and Gleason were long- standing acquaintances, having met in 1978. In a conversation on November 5, Gleason told Adams that he had made arrangements to keep the vehicle in storage for a few weeks until it could be cut up. By running the VIN through the National Crime Information Center ("NCIC") computer, Adams learned that the Caprice had been reported stolen on October 28, 1987. Adams arranged for a special agent of the Internal Revenue Service ("IRS") to come to the site on November 25, 1987 to take pictures of the Caprice. Adams -7- 7 conducted surveillance, and at some point after November 25 he noticed that the car had been removed; however, he did not know precisely when the car was removed from the Watertown GSA facility. Between December of 1987 and early summer of 1988, Adams, without Gleason's knowledge, tape recorded a number of conversations between Adams and Gleason. In a taped conversation on February 8, 1988, Gleason told Adams that Murray hid the car "until they could get rid of it" and that Murray said he wanted to get the parts from the car. [Tr. 3:112-114] The tapes, however, did not corroborate Gleason's testimony that he had seen Murray and another, unidentified person cutting up the Caprice. Furthermore, Gleason did not say to Adams on tape that Loder admitted to Gleason that he helped Murray to get rid of the car, although Gleason later testified that Loder did indeed admit to this.2 ____________________ 2Defendant argues that several facts call Gleason's credibility, which is central to Loder's conviction, into question. Gleason testified to consulting with a psychiatrist shortly after his conviction due to fear of being accused of something he did not do. He further testified to taking a number of medications, due both to his psychiatric condition and to a back injury, which affected his memory, particularly with regard to dates. Gleason denied ever using a counterfeit Massachusetts Police license plate on his car, but Adams and Belmont Police Detective John Trischetta testified to seeing a fake police plate on -8- 8 II. ___ When a defendant challenges his criminal conviction, claiming that the government failed to present sufficient evidence to prove the defendant guilty of the charged crime, the court is faced with a formidable standard of review. In examining such a challenge, the court must "view the evidence, together with all reasonable inferences that may be drawn therefrom, in the light most favorable to the government," United States v. Campa, 679 F.2d 1006, _____________ _____ 1010 (1st Cir. 1982), and while so doing, must ask whether "a rational trier of facts could have found guilt beyond a reasonable doubt." United States v. Ingraham, 832 F.2d 229, _____________ ________ 239 (1st Cir. 1987), cert. denied, 486 U.S. 1009 (1988). ____ ______ See also United States v. Torres Lopez, 851 F.2d 520, 527 _________ _____________ ____________ (1st Cir. 1988), cert. denied 489 U.S. 1021 (1989). The ____ ______ court must apply this standard both to direct and to circumstantial evidence; "[c]ircumstantial evidence is intrinsically no different from testimonial evidence, and is entitled to similar weight." United States v. Van Helden, _____________ __________ 920 F.2d 99, 101 (1st Cir. 1990) (citations omitted). Thus, ____________________ Gleason's car. Finally, Gleason testified to obeying all terms and conditions of his federal parole, but on cross examination he conceded that he had been convicted of shoplifting while on federal parole, although no action had been taken against him by his probation officer. -9- 9 the government may use circumstantial evidence to prove its case. However, the total evidence, with all reasonable inferences made in the light most favorable to the government, must be such that a rational trier of fact could have found guilt beyond a reasonable doubt. United States _____________ v. Mena, 933 F.2d 19, 23 (1st Cir. 1991); United States v. ____ _____________ Campa, 679 F.2d at 1006. Furthermore, the government need _____ not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction. United States v. Guerrero-Guerrero, 776 F.2d _____________ _________________ 1071, 1075 (1st Cir. 1985), cert. denied, 475 U.S. 1029 ____ ______ (1986). Rather, the jury is at liberty to select freely among a variety of reasonable alternative constructions of the evidence. United States v. Smith, 680 F.2d 255, 259 _____________ _____ (1st Cir. 1982), cert. denied, 459 U.S. 1110 (1983). ____ ______ Finally, this court reviews a district court's denial of a defendant's motion for a judgment of acquittal using the identical standard employed to measure the sufficiency of evidence supporting a guilty verdict. Accordingly, we must determine whether, viewing all the evidence in the light most favorable to the government, including all reasonable inferences to be drawn from such evidence, a rational trier of fact could have found guilt beyond a reasonable doubt. -10- 10 United States v. Sanchez, 943 F.2d 110, 114 (1st Cir. 1991) ______________ _______ (citations omitted). The mail fraud statute makes it a crime to use the United States Postal Service or mails to execute a scheme or artifice devised to defraud by means of false or fraudulent pretenses, representations or promises.3 There is no doubt ____________________ 3The specific language of the mail fraud statute is as follows: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined -11- 11 that the evidence supports a finding that James and David Morrison were guilty of mail fraud; they submitted false insurance claims to Aetna and Aetna issued, through the United States mails, settlement checks to James Morrison and GMAC. The Morrisons were the principals in this scheme of mail fraud. At issue is whether the government has succeeded in presenting evidence sufficient to show that Paul Loder is guilty of aiding and abetting the Morrisons in committing mail fraud. The aiding and abetting statute defines the crime of aiding and abetting as follows: (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. 18 U.S.C.A. 2 (West 1969). In order to find a defendant guilty of aiding and abetting, the government must show both that the principal committed the underlying substantive crime, United States v. McNatt, 813 F.2d 499, 502 (1st Cir. _____________ ______ ____________________ not more than $1,000,000 or imprisoned not more than 30 years, or both. 18 U.S.C.A. 1341 (West Supp. 1994). -12- 12 1987); United States v. Perez, 922 F.2d 782, 785 (11th ______________ _____ Cir.), cert. denied, 111 S. Ct. 2840 (1991), and that the ____ ______ defendant "associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." United States v. Garcia- _____________ _______ Rosa, 876 F.2d 209, 217 (1st Cir. 1989). See also United ____ ________ ______ States v. Lema, 909 F.2d 561, 569 (1st Cir. 1990); United ______ ____ ______ States v. Delgado Figueroa, 832 F.2d 691, 696 (1st Cir. ______ _________________ 1987). Several cases offer guidance as to the degree of knowledge that a defendant must possess in order to satisfy the second prong of the definition of aiding and abetting. "In order to convict a defendant of aiding and abetting, the government must prove that the defendant in some way associated himself with the fraudulent scheme and that he __ shared the criminal intent of the principal." United States ____________________________________________ _____________ v. Serrano, 870 F.2d 1, 6 (1st Cir. 1989) (emphasis added) _______ (citation omitted). See also United States v. Valencia, 907 ________ _____________ ________ F.2d 671, 680 (7th Cir. 1990) ("The state of mind required for conviction as an aider and abettor is the same state of mind as required for the principal offense."); United States _____________ v. Barclay, 560 F.2d 812 (7th Cir. 1977) (appeals court _______ reversed a conviction for bank fraud and abetting bank fraud -13- 13 because the trial judge's instructions permitted the defendant to be convicted without finding that he knew that the principal was going to make a false entry with the specific intent to defraud the bank, and without finding that the defendant shared the principal's specific intent to defraud the bank); United States v. Gallishaw, 428 F.2d 760 _____________ _________ (2d Cir. 1970) (when defendant supplied a machine gun to principal which principal later used in a bank robbery, the appeals court reversed defendant's conviction for conspiracy to commit a bank robbery and aiding and abetting a bank robbery because trial judge's instructions allowed jury to convict defendant without a finding that defendant shared principal's specific intent to rob a bank). The specific intent requirement of the crime of aiding and abetting requires that the defendant consciously share the principal's knowledge of the underlying criminal act; "[a] general suspicion that an unlawful act may occur is not enough." United States v. Labat, 905 F.2d 18, 23 (2d Cir. _____________ _____ 1990). However, the government may prove its case through circumstantial evidence, and need not preclude every reasonable hypothesis in order to sustain a conviction. See ___ supra pp. 6-7. Also, "[i]t is well settled that a culpable _____ aider and abetter need not perform the substantive offense, -14- 14 be present when it is performed, or be aware of the details __________________________ of its execution." United States v. Garcia-Rosa, 876 F.2d _________________ _____________ ___________ at 217 (emphasis added) (citation omitted). In order to sustain a conviction in the instant case, the government must show that the defendant, Paul Loder, consciously shared in the specific criminal intent of the principals, the Morrisons, to commit mail fraud. In other words, the government must present evidence that would allow a rational trier of fact to conclude that Loder had knowledge that he was furthering mail fraud. Although he need not be aware of all the details of the mail fraud, a general suspicion on Loder's part that his participation in dismantling the Caprice was "for some nefarious purpose"4 is not enough to make him guilty of aiding and abetting mail fraud. In this case, the government claims that the record supports the conclusion that Paul Loder was aware of ____________________ 4Near the close of the evidence, the judge made the following comment at a side bar conference: I don't understand the evidence. You say these two guys get a car and they cut it up. Certainly they have to know when they cut up a brand-new car that there is some nefarious purpose. (Tr. 4:7). Accepting the trial judge's characterization of what the defendant would "have to know," the requirement that the defendant share the specific criminal intent of the principal would still not be met. -15- 15 the fraudulent scheme planned by the Morrisons, and that he was a willing participant in that scheme. In support of this assertion, the government points to several pieces of evidence: Loder had, in the past, worked for Murray at Murray's auto parts store and was currently Murray's subordinate on the transportation crew of SFH; Gleason testified that, in separate conversations with him, both Murray and Loder had talked about getting rid of the Caprice, and Loder mentioned keeping the license plate for insurance; Gleason also testified that he saw Murray and another person whose face was obscured by a welding mask cutting the roof off of the Caprice in a government warehouse on a weekend; and the Caprice, although damaged, was a brand new car. The government argues that a rational trier of fact could reasonably infer from this evidence that Loder and Murray were responsible for the Caprice, had dismantled and disposed of it, and did so for some nefarious purpose. The government further maintains that the jury could as easily have inferred or concluded from the evidence that the nefarious purpose was that of a fraudulent insurance scheme as that the nefarious purpose was that of disposal of a stolen car. The defendants counter with the argument that even if the evidence would allow a jury to -16- 16 conclude that Loder participated in dismantling the car and knew there was something wrong with doing so, the government has nevertheless failed to show the specific intent and knowledge necessary to sustain a conviction of aiding and abetting in mail fraud. The government contends that the evidence supports a finding that Loder did have specific knowledge of the ___ Morrisons' insurance scam and that he acted in willful furtherance of the scam. They first maintain, and this court agrees, that based on Gleason's testimony, the jury could appropriately conclude that Murray had knowledge of the Morrisons' identity, of the circumstances of the accident in which the Caprice was damaged, and, most importantly, of the Morrisons' fraudulent insurance claim. The prosecution then asserts that "[b]ecause the defendant and Murray dismantled and disposed of the car together, the jury could reasonably conclude as well that Murray passed such information on to the defendant in explanation of the purpose of their efforts." (Appellee's Br. at 20) This assertion is at the core of the government's case; if a rational jury could reasonably infer from the evidence presented first that Loder did help Murray to disassemble the Caprice and second that Murray explained the mail fraud -17- 17 scheme to Loder, then this court must uphold Loder's conviction. The question then, is whether these two inferences are indeed reasonable. This court finds that the first inference, that the person helping Murray to dismantle the Caprice was Paul Loder, is reasonable. Although the face of the person that Gleason saw helping Murray was obscured by a welding mask, Gleason nevertheless testified that Loder told him that he helped Murray to get rid of the Caprice. Should the jurors chose to believe Gleason, it is reasonable for them to conclude that Loder did as he said he would do and helped Murray to dismantle the car. Indeed, such a conclusion would be supported by Loder's own admission of actual participation. It is true that Gleason did not mention Loder's admission of helping Murray while Gleason was on tape. However, a reasonable jury could nonetheless have believed that Loder did tell Gleason that he helped to dismantle the car. Likewise, the defendant's concerns as to Gleason's reliability as a witness are not sufficient to endanger the jury's factual finding with regard to Loder. Drawing, as we must, all reasonable inferences in the light most favorable to the government, we find that nothing would inhibit a rational jury from believing Gleason and -18- 18 concluding that Loder assisted Murray in disassembling the Caprice. However, we reject the notion that a rational jury could have reasonably made the second inference at issue. To assume that just because Murray and Loder dismantled the car together therefore Murray told Loder that they were doing so in furtherance of a scheme of mail fraud, is unreasonable and implausible. This court finds that no evidence at trial was presented that would allow a rational trier of fact to conclude that Murray conveyed this information to Loder. No one testified to telling Loder about the mail fraud, no one testified that Loder mentioned knowing about the mail fraud, no one even testified to being told that Loder had been told about the mail fraud. While it is true that circumstantial evidence must be given the same weight as testimonial evidence in determining sufficiency of the evidence, in this case, even giving the government the benefit of the doubt, the circumstantial evidence is too weak to support a reasonable inference of guilt. We have also considered whether a reasonable jury could conclude -- even without any direct disclosure to Loder by Murray -- that Loder must have known that insurance -19- 19 fraud was the objective in destroying the car. If the surreptitious destruction of cars occurred only for this purpose, or at least rarely for any other, that might be enough for a jury to infer knowledge on Loder's part. But in fact there are other plausible reasons for such an action (e.g., "chopping" a stolen car to recover parts; destroying ____ the evidence of another crime such as bank robbery or kidnapping). Thus, absent additional evidence, we do not think that a jury could conclude beyond a reasonable doubt that Loder must have known that the purpose in this instance was insurance fraud. This court declines to sustain Paul Loder's conviction. -20- 20