Peter M. SCHULTZ and Pamela A. Schultz, Plaintiffs, Appellants,

v.

RHODE ISLAND HOSPITAL TRUST NATIONAL BANK, N.A., et al., Defendants, Appellees.

BOWDOIN CONSTRUCTION CORP., Plaintiff, Appellant,

v.

RHODE ISLAND HOSPITAL TRUST NATIONAL BANK, N.A., et al., Defendants, Appellees.

ALLENBY ENTERPRISES, INC., et al., Plaintiffs, Appellants,

v.

RHODE ISLAND HOSPITAL TRUST NATIONAL BANK, N.A., et al., Defendants, Appellees.

Nos. 95–1997, 95–2113 and 95–2172.

United States Court of Appeals, First Circuit.

Heard June 7, 1996.

Decided Aug. 22, 1996.

Edwin A. McCabe, with whom McCabe Brown Sutherland, Joseph P. Davis III, and Lane, Altman & Owens were on brief, Boston, for plaintiffs-appellants.

Joseph L. Kociubes, with whom Peter Alley, Denise Jefferson Casper, and Bingham, Dana & Gould were on brief, Boston, for Rhode Island Hospital Trust National Bank.

Allen N. David, Elizabeth Z. Holmes, and Peabody & Arnold, on brief, Boston, for Federal Deposit Insurance Corp. as receiver of Coolidge Bank and Trust Co.

Robert D. Cultice, Louis J. Scerra, Jr., and Goldstein & Manello, P.C., on brief, Boston, for Chrysler First Business Credit Corp.

Before TORRUELLA, Chief Judge, and CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

These three actions, consolidated for appeal, arise out of a failed real estate venture involving the purchase and redevelopment of the Sea Crest Hotel in Falmouth, Massachusetts ("the Sea Crest"). In a federally registered public offering, investors purchased condominium unit deeds and "pooled income" interests in the Sea Crest project. One of the offering's features, as disclosed in the prospectus, was that the offering would be terminated and all investor deposits refunded if the aggregate amount of investments sold did not reach a minimum subscription level ("MSL") by a set deadline. Plaintiffs asserted that Rhode Island Hospital Trust National Bank ("RIHT"), the lender that financed

the developer's purchase of the Hotel and served as the escrow agent responsible for holding investor deposits, was liable to them for purportedly failing to determine that the MSL requirement had not in fact been satisfied by the requisite date. The district courts concluded, as a matter of law, that the plaintiffs' claims against RIHT for fraud, negligent misrepresentation, breach of contract, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, were all deficient. We agree that plaintiffs have established no legal basis for holding RIHT liable for their losses. Accordingly, we affirm.

## I.

### Factual Background

In the mid–1980's, Eugene Marchand developed a plan to purchase and renovate the Sea Crest Resort and Conference Center, a large beach resort on Cape Cod. Marchand sought to revitalize the hotel as a convention-oriented facility. The plan involved converting the Sea Crest into a condominium, and then selling the individual condominium units to investors, together with interests in the pool of income to be generated from the resort. The condominium units and these "pooled income" interests were to be sold as registered securities in a public offering. The issuer of the securities would be Marchand's development company, Laurel–Sea Crest Realty Sales Corp. ("Laurel"), of which Marchand was the sole shareholder. Laurel's purchase of the Sea Crest, for $19.4 million, would be financed through sales to investors and a bank loan from RIHT. With projected expenses of $40.5 million and total expected gross proceeds from the offering projected at $45 million, Laurel stood to make a net profit of $4.5 million.

On September 12, 1986, Laurel filed a registration statement and prospectus with the SEC, describing the proposed offering of 266 "condominium hotel interests." The prospectus stated that the offering would be conditioned upon a minimum level of investor participation:

Unless 60 Hotel Interests are subscribed for by qualified investors ("Minimum Subscription Level") within 60 days of the effective date of the Registration Statement of which this Prospectus is a part, but in no event later than December 31, 1986, this offering will be withdrawn and all funds will be returned promptly to subscribers.

The prospectus also stated that every investor would be required to "pay a down payment of 10% of the purchase price of the Hotel Interest (the 'Escrow Deposit')," which would be "deposited ... in a segregated, federally insured, interest bearing account ... at the Rhode Island Hospital Trust National Bank ... on behalf of Investor." The prospectus named RIHT as escrow agent for the offering.

As Laurel waited for the registration statement to be declared effective by the SEC, it secured the financing it needed to purchase the Sea Crest. On November 14, 1986, RIHT issued a commitment letter to Laurel approving a fourteen million dollar first mortgage construction loan to be used by Laurel in acquiring and renovating the Sea Crest facility. RIHT's commitment, like the offering, was conditioned upon the "presale" of a minimum number of Sea Crest interests prior to December 29, 1986, the expiration date of RIHT's commitment letter.[1]

As of the date that RIHT issued its commitment letter to Laurel, however, the SEC had yet to approve Laurel's registration statement. In fact, the registration statement was not declared effective by the SEC until December 12, 1986, leaving just two and a half weeks for Laurel to achieve the MSL set in the prospectus and the minimum number of presales required by RIHT. It was clear that Laurel needed more time. Laurel sought to restructure the offering and obtain a new commitment agreement from RIHT, with a new timetable for meeting the minimum presale requirement. RIHT agreed to renegotiate.

---

1. RIHT's presale requirement was, in fact, more stringent than the MSL requirement. The commitment letter specified that "[p]rior to closing, a minimum of 80 units must be under written agreement of purchase-sale with a 10% non-refundable deposits [sic]," and that those 80 units must account for "no less than $13.6 million" in gross proceeds.

As Laurel and RIHT neared agreement on a new loan commitment, Laurel filed, on March 2, 1987, a post-effective amendment to its original registration statement. The amendment established a new deadline for Laurel to meet the MSL requirement. It also restructured the requirement to condition the offering on a minimum dollar amount of aggregate sales, rather than a minimum number of unit sales. The amended prospectus explained:

> Unless Hotel Interests of $6,000,000 in aggregate purchase price are subscribed for by qualified investors ("Minimum Subscription Level") within 120 days of the effective date [2] of the Registration Statement of which this Prospectus is a part, this offering will be withdrawn and all funds will be returned promptly to subscribers.

The amended prospectus left unchanged the original prospectus's representation that each investor would be required to tender a down payment equal to ten percent of the selling price of the unit to be purchased, which would be deposited in an escrow account held by RIHT.

RIHT issued a new commitment letter to Laurel on March 30, 1987. This time, RIHT agreed to give Laurel an 18.3 million dollar loan, conditioned upon the presale of only 40 units with a minimum aggregate selling price of $6 million, each presale requiring a ten percent nonrefundable investor deposit. Laurel was required to satisfy the new 40–unit presale condition by no later than April 10, 1987, the expiration date of the new commitment letter.

Apart from RIHT's lending relationship with Laurel, the bank's only role in the Sea Crest offering was to act as escrow agent. RIHT did not sign the registration statement. Nor did it participate in promoting the offering or in selling or soliciting subscriptions. RIHT's duties as escrow agent were to be governed by a written escrow agreement between Laurel and RIHT, addressed to the investor. A copy of the agreement, annexed as an exhibit to Laurel's registration statement, was to be provided to each subscribing investor. As will be discussed, there is some dispute as to the particular form of agreement by whose terms RIHT agreed to be bound. It is clear, however, that RIHT assumed at most a duty to hold investors' deposits in escrow until "[Laurel] shall verify to the Bank that ... $6,000,000 in aggregate purchase price for Hotel Interests have been subscribed for and received as required under the Registration Statement...."

As the offering proceeded, Laurel, through its selling agent (Broad Reach Capital), collected purchase and sale agreements for individual Sea Crest condominium units ("unit sale agreements"). Notwithstanding the prospectus's representations that investors would be required to tender a ten percent non-refundable "escrow deposit" upon subscribing to the offering, Laurel and Broad Reach Capital accepted *promissory notes* for ten percent of the purchase price—in lieu of cash deposits—from almost half of the investors who signed unit sale agreements prior to the MSL deadline. Such cash deposits as were tendered by the investors were placed in an escrow account at RIHT. But as the deadline for meeting the MSL approached, only a total of some $309,000 had been deposited into the RIHT escrow account.

RIHT and Laurel conducted their loan closing on April 9, 1987, just prior to the expiration date of the March commitment letter. At the closing, RIHT was provided with copies of the unit sale agreements that had been executed. An officer of the bank counted the sale agreements to verify that there had been at least 40 units sold (as required in RIHT's loan commitment letter) and tallied the aggregate amount of sales to verify that the six million dollar MSL requirement had been met (as set forth in the agreement and the prospectus). No one at RIHT undertook to verify whether there was a ten percent deposit in escrow for each unit subscription. Having satisfied itself that at least 40 subscriptions and $6 million in aggregate sales had been achieved, RIHT proceeded to close its loan with Laurel and thereafter released the escrowed investor deposits to Laurel. Laurel purchased the Sea

---

**2.** The 120th day after December 12, 1986, the effective date of the registration statement fell on April 11, 1987, a Saturday.

Crest and separately closed on its sales of individual condominium units to investors.

In May 1987, Laurel hired Bowdoin Construction Corp. ("Bowdoin") to serve as the general contractor for the renovation of the Sea Crest. Pursuant to a letter of intent from Laurel, Bowdoin began construction work and arranged the necessary subcontracts. Based on a decision by Marchand, Bowdoin continued its construction work through the 1987 summer season, causing a fall-off in revenues to the resort and putting a wrinkle into Laurel's ongoing sales efforts.

By late September 1987, Laurel was under severe financial strain. It had stopped making payments to Bowdoin, even though Bowdoin continued construction. On October 1, RIHT downgraded the credit status of its loan to Laurel. The stock market crash later that month only worsened matters, and in November 1987, Laurel defaulted on the RIHT loan. Laurel and RIHT discussed restructuring or refinancing the loan. Bowdoin inquired about the status of Laurel's funding. After allegedly being assured that it would be paid through new financing from RIHT, Bowdoin continued with construction. In the meantime, restructuring negotiations between Laurel and RIHT had ended unsuccessfully.

By January 1988, when Bowdoin finally ceased construction, it had incurred unreimbursed expenses of over $1 million. A month later, Laurel filed a Form 8–K with the SEC disclosing that the Sea Crest offering would be indefinitely suspended, with only 58 of the total 266 condominium units having been sold. Soon afterward, a number of lawsuits were filed. In April 1988, RIHT sued Laurel to collect on its loan. In July 1988, Bowdoin filed an action for breach of contract and enforcement of a mechanic's lien in state court, but then voluntarily dismissed the action based, allegedly, on Laurel's representation that doing so was Bowdoin's best chance of recovering any of its unpaid debts.[3] Ulti-

mately, Bowdoin collected only a fraction of the amount owed to it by Laurel. Laurel, RIHT, and others were named in suits filed by investors, as well as in a newly instigated action by Bowdoin.

## II.

### Procedural Background

#### A. District Court Proceedings

Three separate cases have been consolidated for purposes of this appeal. Two of the cases, *Schultz v. RIHT* and *Allenby Enters., Inc. v. RIHT*, are brought by investors in the Sea Crest offering.[4] The third case, *Bowdoin Constr. Corp. v. RIHT*, is brought by Bowdoin. The *Schultz* and *Allenby* plaintiffs asserted claims against Laurel, RIHT and several others for alleged violations of the federal securities laws and civil RICO, and for common law fraud, negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing. The *Bowdoin* complaint asserted claims against Laurel, RIHT, and others for violations of civil RICO, breach of contract, and breach of the covenant of good faith and fair dealing.

In October 1993, before the *Schultz* action was scheduled to go to trial, the plaintiffs in all three actions reached a settlement agreement with Laurel, Marchand, and certain other affiliated parties, and dismissed all claims against them, with prejudice. In exchange, the plaintiffs received a promise from the settling defendants to waive the attorney-client privilege and to provide interviews and trial testimony as requested by the plaintiffs. No money changed hands.

The *Schultz* action proceeded to trial against RIHT and the other remaining defendant (a bank that had provided financing to some of the investors) in January 1994, before Chief Judge Tauro. The plaintiffs presented twelve days of testimony, including the testimony of Eugene Marchand. At the

---

3. After Bowdoin dropped the state court lawsuit and discharged the lien, RIHT sold its interest in the Sea Crest loan, at a $5.7 million loss, to Coolidge Bank (who had to that point owned a participation interest in the loan).

4. The plaintiffs in the *Schultz* action purchased a total of five condominium units in April 1987 (prior to the MSL deadline), at an aggregate

purchase price of approximately $1 million. There are 38 plaintiffs in the *Allenby* action. Collectively, they purchased 33 condominium units at an aggregate purchase price of some $5 million. Approximately $1.5 million of the *Allenby* plaintiffs' purchases were made *after* the MSL deadline (April 10, 1987) had passed.

end of the plaintiffs' case, the defendants moved for judgment as a matter of law. In its memorandum of decision, the district court concluded that *Central Bank v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), required the dismissal of the plaintiffs' claims for aiding and abetting securities fraud under Section 10(b) of the Securities Exchange Act of 1934. The court also concluded that the plaintiffs had failed to present adequate evidence on any of their common law claims or their RICO claim, and granted the motion for judgment as a matter of law.

Thereafter, Judges Keeton and Saris granted summary judgment motions filed by RIHT in the *Allenby* and *Bowdoin* actions, respectively. In deciding the *Allenby* motion, Judge Keeton, discerning no material difference between the issues in *Allenby* and *Schultz,* followed Judge Tauro's decision, based both on an independent assessment of the case and as a matter of *stare decisis.* In *Bowdoin,* in which the plaintiff asserted RICO violations predicated upon allegations of aiding and abetting securities fraud, Judge Saris entered summary judgment in favor of RIHT, on the dual grounds that such a claim could not be viable after *Central Bank,* and that plaintiffs had, in any event, failed to adduce sufficient evidence of a "pattern" of racketeering activity.

### B. Posture on Appeal

The parties informed us at oral argument that the only remaining defendant in all three of these cases, at least for purposes of this appeal, is RIHT.[5] We limit our review, therefore, to those claims seeking to hold RIHT responsible for the plaintiffs' alleged injuries.

**5.** Plaintiffs' counsel stated at oral argument that, although one other party nominally remains in the case, plaintiffs would be content to have this court's decision turn solely upon a determination of the merits of the claims against RIHT.

**6.** RIHT broadly argues, as a basis for affirmance independent of the underlying merits of these actions, that the plaintiffs' claims in all three cases are barred as a result of their settlement with, and prejudicial dismissal of their claims against, the Laurel defendants. RIHT further contends that the judgment entered by the district court in *Schultz,* if affirmed, constitutes res judicata in relation to the plaintiffs' claims in the

In each of the three cases, we review *de novo* the district court's entry of judgment as a matter of law. Because the appeals largely raise the same dispositive issues (albeit on somewhat different records), we distinguish them only as necessary. We look to whether, viewing the record in each case in the light most favorable to the plaintiffs, any reasonable jury could find in the plaintiffs' favor. *See* Fed.R.Civ.P. 50(a) (*Schultz* ); Fed.R.Civ.P. 56(c) (*Allenby; Bowdoin* ). Having assessed the merits of each of the plaintiffs' theories of liability under this standard of review, we now affirm.[6]

### III.

### Breach of Contract

RIHT's only relationship with the investor plaintiffs arose out of the bank's role as escrow agent in the Sea Crest offering. The *Schultz* and *Allenby* plaintiffs assert that RIHT failed in that capacity, acting in breach of the terms of the written escrow arrangement, in accordance with which RIHT agreed to hold the deposits to be tendered by investors. More specifically, the plaintiffs contend that RIHT violated the terms of the escrow agreement when, on April 9, 1987, it released all escrowed funds to Laurel, even though, allegedly, the offering's MSL requirement had not been satisfied.[7]

There is a threshold dispute as to the particular escrow agreement that governs. Plaintiffs contend that RIHT was in breach of the terms of an agreement referred to by the parties as the "long-form" escrow. RIHT replies that it was bound only by the terms of the so-called "short-form" escrow, but argues, in the alternative, that even if it was bound by the long-form escrow, the record establishes that no breach occurred.

*Allenby* and *Bowdoin* actions, and that the latter two actions are barred on a theory of non-party claim preclusion. *See Gonzalez v. Banco Central Corp.,* 27 F.3d 751, 755 (1st Cir.1994); *see also Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 F.3d 1054, 1069–70 (6th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 296, 133 L.Ed.2d 203 (1995). We decline the invitation to venture into this complex and unsettled area of the law, and rest our affirmance on the merits of the three cases before us.

**7.** The district court in the *Schultz* action reasoned that only those investors whose funds were

The short-form escrow agreement was attached as an exhibit to the registration statement that Laurel filed with the SEC in September 1986, and had been signed by RIHT in November 1986. The short-form provided, in pertinent part:

TO PROSPECTIVE PURCHASERS OF HOTEL INTERESTS IN SEA CREST CONDOMINIUM

Rhode Island Hospital Trust National Bank (the "Bank") ... having been requested to act as escrow agent ("Escrow Agent") for deposits to be made by prospective purchasers ("Buyer") of Hotel Interests in the above-referenced Condominium from Laurel–Sea Crest Realty Sales Corp. ("Seller") ... does hereby accept such request and agrees to hold deposits made payable to the Sea Crest Condominium Escrow Account, and received by it, upon the following terms and conditions to which Buyer and Seller agree to be bound by executing the Unit Sale Agreement ("Agreement") for Buyer's Hotel Interest, to which a copy of this escrow letter will be annexed.

1. The Bank agrees to maintain such deposit (the "Deposit") at its bank for the benefit of Buyer and Seller....

2. In the event the [Unit Sale] Agreement is consummated, as evidenced by Buyer's acceptance of a deed to the Hotel Unit, or by written statement to that effect executed by or on behalf of Buyer and Seller, Escrow Agent shall pay over the Deposit to Seller, and shall pay such interest as may have accrued thereon, to Buyer....

The long-form escrow agreement was filed with the SEC and signed by RIHT at some later time, the precise date being in dispute. The first paragraph of the long-form agreement was the same as that in the short-form, but the body was substantially different. The long-form agreement provided, in relevant part:

1. The Bank agrees to maintain such deposit (the "Deposit") at its bank for the benefit of Buyer and Seller.... The Deposit shall be held by the Bank until the Seller shall verify to the Bank that (a) $6,000,000 in aggregate purchase price for Hotel Interests have been subscribed for and received as required under the Registration Statement (the "Minimum Subscription Level") and thereafter disbursed ... or (b) such Minimum Subscription Level has not been achieved within 120 days of the effective date of the Registration Statement with the Securities and Exchange Commission. In the event the Minimum Subscription Level is not achieved within such 120 day period, all deposits and interest accrued thereon shall be promptly returned to Buyer.

2. In the event the Minimum Subscription Level is achieved and the [Unit Sale] Agreement is consummated, as evidenced by Buyer's acceptance of a deed to the Hotel Unit, or by written statement to that effect executed by or on behalf of Buyer and Seller, Escrow Agent shall pay over the Deposit to Seller, and shall pay such interest as may have accrued thereon, to Buyer....

Both the long- and short-form escrow agreements ended with the following clauses:

8. Escrow Agent assumes no obligations or responsibility hereunder other than to make delivery of the Deposit, and any earnings thereon, as herein provided....

It is understood and agreed that a copy of this instrument will be annexed as an exhibit to the [Unit Sale] Agreement. Buyer shall be entitled to rely upon this escrow agreement, with the same force and effect as if the Bank had contracted directly with Buyer....

The crucial difference between the two agreements lies in the description of the

actually deposited into the escrow account had standing to challenge RIHT's compliance with the escrow agreement. The record shows that the two plaintiffs in the *Schultz* action did not pay a ten percent cash down payment, instead signing a promissory note to Laurel for that amount. Most of the plaintiffs in the *Allenby* case, on the other hand, did pay a ten percent

deposit, but a number of the units—representing about $975,000 in aggregate sales—were sold without a cash deposit having been tendered. Furthermore, some of the *Allenby* plaintiffs purchased their units *after* the MSL deadline had passed. While we find the district court's point to be forceful, we need not rely on it, given our disposition of the merits of the issue.

conditions that were to trigger RIHT's duty to release any escrowed funds to Laurel. The long-form agreement linked RIHT's duty to release funds from escrow upon the meeting of the MSL requirement; the short-form agreement did not.

There is no dispute that RIHT at some point signed *both* the short- and long-form agreements. The question is when. The plaintiffs argue that RIHT became bound by the long-form agreement before the April 1987 MSL deadline, and that RIHT therefore had a duty of "verif[ication]" with respect to the satisfaction of the MSL requirement before releasing the funds in escrow. RIHT, on the other hand, concedes that it signed the long-form agreement at *some* point, but not before June 1987. Thus, RIHT asserts that, as of April 1987, it was bound only by the short-form agreement, which makes no mention of the MSL requirement.[8] Even accepting the plaintiffs' rendition of the record, however, we conclude that no rational trier of fact could find that RIHT committed a breach.

We look first to the express terms of the long-form escrow agreement.[9] Under that agreement, RIHT was required to "hold deposits made payable to the Sea Crest Condominium Escrow Account, and received by it" until "[Laurel] shall verify to the Bank that (a) $6,000,000 in aggregate purchase price for Hotel Interests have been subscribed for and received as required under the Registration Statement (the 'Minimum Subscription Level') . . . ." This language unambiguously limits RIHT's obligations as escrow agent to holding deposits "received by it" until Laurel "verifi[ed]" that $6 million in subscriptions had been received.

■ The record before us permits no genuine dispute that RIHT satisfied its limited duties under the agreement. The evidence is clear that RIHT did not release any funds that had been deposited into the Sea Crest

escrow account until it had been provided by Laurel (prior to the MSL deadline) with copies of executed unit sale agreements with an aggregate face value in excess of $6 million. Plaintiffs concede that there is uncontradicted testimony to this effect.

Plaintiffs' argument is that RIHT was required to do more. They contend that RIHT should have refused to release funds in escrow on April 9, 1987 on the grounds that: (i) many of the unit sales counted toward the MSL were not backed by ten percent cash deposits; (ii) Laurel had pledged seven Sea Crest units as collateral for a "bridge" loan that it had obtained from Wedgestone Realty Investors Trust, the proceeds of which were applied to Laurel's purchase of the Sea Crest; and (iii) the $6 million in unit sales that were applied to the MSL computation had not actually been received by Laurel before the MSL deadline.

The response is that the escrow agreement cannot fairly be read to say that any one of these circumstances created a bar to the disbursement of the escrowed funds. Under the terms of its escrow agreement, RIHT's role in the Sea Crest offering was a limited one, narrowly defined in a written agreement. The escrow agreement did not impose on RIHT a generalized duty to police the offering. To the contrary, the agreement disclaimed any duty to the parties in escrow "other than to make delivery of the [escrowed funds], and any earnings thereon."

Thus, although the fact that Laurel sold a number of Sea Crest units without taking a ten percent deposit from the purchaser was arguably at odds with the prospectus, there is no language in the escrow agreement conditioning the release of any escrowed funds upon RIHT's having received deposits totalling a full ten percent of the six million dollar minimum sales amount. Similarly, there was nothing about Laurel's "bridge" loan from Wedgestone that obligated RIHT, under the

---

8. On the one hand, RIHT has provided an unrebutted attestation that the only escrow agreement on record with the SEC as of April 1987 was the short-form agreement. On the other hand, there is some evidence (albeit circumstantial) to suggest that RIHT had agreed to be bound by the long-form agreement prior to April 1987. For example, a copy of the long-form agreement (lacking RIHT's signature) was attached to a

letter from Marchand's attorney to RIHT dated March 16, 1987, in which the attorney proposed to RIHT a particular procedure for dealing with interest accruing to the Sea Crest escrow account.

9. The parties appear to agree that Massachusetts law governs.

escrow agreement, to determine that the MSL had not been met, or that funds in escrow were otherwise required to be returned to investors.

Finally, the plaintiffs' argument that $6 million in actual funds had not been "received" prior to RIHT's closing of escrow goes nowhere. To the extent that plaintiffs argue that RIHT itself was required to be in receipt of the $6 million, the argument is inconsistent with the language of the escrow agreement. To the extent that the agreement can be read to require that the $6 million have been "received" at all, the agreement plainly envisions that it would be *Laurel* who would receive the funds, and who would thereafter verify the same to RIHT.

In any event, RIHT's alleged failure to verify the satisfaction of the purported "receipt" requirement does not help the plaintiffs' case. The purported "receipt" requirement is necessarily separate and distinct from the MSL requirement, and satisfaction of the latter did not depend on satisfaction of the former.[10] The only circumstance specified in the escrow agreement as requiring RIHT to return escrow deposits to investors was the failure to attain the MSL; Laurel's alleged non-receipt of $6 million in sales proceeds did *not* require investor funds to be refunded or the offering to be withdrawn. At most, the logic of plaintiffs' theory is that RIHT released escrowed funds too *early*, and *not* that RIHT wrongfully failed to call for termination of the offering.[11]

The question remains whether RIHT, in its capacity as escrow agent, owed any duties to plaintiffs other than those spelled out in the agreement. The Supreme Judicial Court of Massachusetts has recently indicated that there is an absence of discussion in Massachusetts law of whether an escrow agent's duties may extend beyond satisfying the literal terms of the escrow agreement. *See In re Discipline of Two Attorneys*, 421 Mass. 619, 626, 660 N.E.2d 1093 (1996) ("Massachusetts cases have not discussed whether an escrow holder has any duty beyond fulfilling the terms of the escrow.").[12] But we find no support for plaintiffs' broad arguments that RIHT, which is not alleged to have been in a conflict of interest, was required, in effect, to actively root out fraud of which it had no knowledge and to police Laurel's conduct in the Sea Crest offering.[13] *See Two Attorneys*, 421 Mass. at 626–27, 660 N.E.2d 1093 (citing *Maganas v. Northroup*, 135 Ariz. 573, 663 P.2d 565 (1983) (duty to disclose *known* fraud); *Collins v. Heitman*, 225 Ark. 666, 284 S.W.2d 628 (1955) (duty not to engage in self-dealing); *Kitchen Krafters, Inc. v. Eastside Bank of Mont.*, 242 Mont. 155, 789 P.2d 567 (1990) (duty to disclose material facts relevant to escrow), *overruled on other grounds by Busta v. Columbus Hosp. Corp.*, 916 P.2d 122 (Mont.1996); *American State Bank v. Adkins*, 458 N.W.2d 807 (S.D.1990) (duty to avoid self-dealing and conflicts of interest)).

## IV.

### *Other Common Law Claims*

**A. Breach of Covenant of Good Faith and Fair Dealing**

The plaintiffs have not pointed to any record evidence that would permit a finding that RIHT's release of the escrow funds to Laurel was done other than under a good faith belief that the MSL requirement had

---

**10.** The prospectus itself states that "[c]losings [on the individual unit sale agreements] will commence once the Minimum Subscription Level has been satisfied." This language clearly contemplates that the MSL would be satisfied *before* the actual consummation of the unit sale agreements. And because the proceeds from the unit sale agreements that were counted toward the MSL could not have been "received" by Laurel until *after* the closings on those units, it follows that the satisfaction of the MSL could not have depended upon any such "receipt."

**11.** This is not a case involving the fabrication of "sham" transactions designed to create the mere illusion that sales had been generated. The apparent absence of some deposits notwithstanding, there has been no suggestion that any of the unit sale agreements that were counted toward the MSL in this case were anything other than bona fide, binding contracts of purchase and sale.

**12.** *But cf. Schmid v. National Bank of Greece*, 622 F.Supp. 704, 710 (D.Mass.1985) ("The escrow agreement or instructions constitute the full measure of the obligation assumed by the escrow holder and owing to the parties."), *aff'd*, 802 F.2d 439 (1st Cir.1986) (tbl.).

**13.** Despite plaintiffs' contrary suggestion, SEC Rule 10b–9 does not warrant the importation into the escrow agreement of a generalized duty to ensure that the offering as a whole complied with the securities laws. Rule 10b–9 makes it a violation of Section 10(b) of the Securities Ex-

been satisfied, and that all of the conditions for releasing the funds had been met. The record supports no conclusion that RIHT acted with the sort of dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing. *See Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 471–72, 583 N.E.2d 806 (1991); *American Employers' Ins. Co. v. Horton*, 35 Mass. App.Ct. 921, 923, 622 N.E.2d 283 (1993). The district court did not err in summarily disposing of the plaintiffs' claims for the breach of the covenant of good faith and fair dealing.

### B. Fraud and Negligent Misrepresentation

■ Plaintiffs do not seriously argue that RIHT made any affirmative material misrepresentations to them concerning the Sea Crest offering. RIHT did not sign the registration statement, and there is no evidence that RIHT had any involvement in the preparation of the registration statement or other offering materials for the Sea Crest project. Nor did RIHT participate in Laurel's marketing or sales efforts. The only communication between plaintiffs and RIHT appears to have been through the escrow agreement, which was addressed to investors and was to have been annexed to each unit sale agreement.

Absent allegations of affirmative misrepresentations or misstatements by RIHT, the question becomes whether RIHT was guilty of any actionable omissions. Absent a duty to speak, RIHT's silence could not have been fraudulent. *See Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir.1991). RIHT's role in the offering was to hold funds deposited with it until Laurel verified that certain conditions had been met. Even assuming that RIHT, as escrow agent, had a duty to disclose *known* fraud on the part of Laurel, *see, e.g., Maganas*, 663 P.2d at 565 (*cited in Two Attorneys*, 421 Mass. at 626–27, 660 N.E.2d 1093), plaintiffs point to no evidence that would show that RIHT was aware of fraudulent conduct by Laurel or any other party involved in the offering.

change Act of 1934 for any person to make a representation, in connection with an offering, that securities are being offered on any "basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not

It is true that RIHT might have had reason to realize that a number of investors had provided promissory notes in lieu of ten percent cash deposits upon execution of their unit sale agreements. But there is no reason why RIHT should have suspected that this was the result of *fraud.* Indeed, the plaintiffs do not allege that the promissory notes were fraudulently made or procured; rather, they were facially valid, enforceable instruments. Furthermore, Laurel's acceptance of bona fide promissory notes, instead of deposits, was not so obviously inconsistent with the prospectus that RIHT should have concluded that a fraud was being perpetrated. Finally, plaintiffs fail to argue that any nondisclosure by RIHT on this issue would have affected their decision to invest; nor do they explain how any such nondisclosure could have been the cause of their losses. *See, e.g., Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1471–72 (1st Cir.1996) (elements of fraud include proof of reliance and causation).

### C. Aiding and Abetting Fraud

■ The plaintiffs' common law claim of aiding and abetting fraud fares no better. To establish a common law cause of action for aiding and abetting, plaintiffs must at least demonstrate some measure of "active participation" and the knowing provision of substantial assistance by RIHT to the principal's (here, Laurel's) alleged fraud. *See Spinner v. Nutt*, 417 Mass. 549, 556, 631 N.E.2d 542 (1994). Plaintiffs point to nothing in the record that would satisfy these basic elements. Indeed, the evidence is to the contrary. In his testimony in the *Schultz* trial, Marchand himself expressly disavowed the existence of any sort of association between Laurel and RIHT other than an arm's length business relationship.

### V.

### RICO Violations

In order to prevail on a RICO claim, a plaintiff must prove, *inter alia,* that the de-

sold," unless the offering is structured in a specified way. 17 C.F.R. § 240.10b–9. Here, however, there is no support for a finding that the Sea Crest offering did not comply with Rule 10b–9 or, even more basically, that RIHT ever made any "representation" covered by the Rule.

fendant engaged in a "pattern of racketeering activity." *See* 18 U.S.C. § 1962. Here, RIHT argues that the district court correctly granted judgment in its favor on plaintiffs' RICO claims, because plaintiffs have failed to establish that RIHT's conduct falls within any of the categories of "racketeering activity" described in the statute, *see* 18 U.S.C. § 1961(1), and because plaintiffs have failed to adduce evidence of the requisite "pattern" of predicate acts necessary to trigger RICO liability, *see* 18 U.S.C. § 1962(b)–(c).

## A. Establishment of a Predicate Act

Plaintiffs argue that, on the record, a rational trier of fact could find that RIHT engaged in three racketeering predicates: (i) aiding and abetting securities fraud; (ii) mail fraud; and (iii) wire fraud. The district court found that "aiding and abetting securities fraud" cannot be a RICO predicate, in light of the Supreme Court's decision in *Central Bank,* 511 U.S. at 164, 114 S.Ct. at 1455 (1994) (no private right of action for aiding and abetting under Section 10(b) of the Exchange Act), and that the record supports no finding of mail or wire fraud by RIHT.

■ We reserve to another day the issue of whether *Central Bank* necessarily implies that aiding and abetting securities fraud cannot be a "racketeering activity" within the meaning of § 1961(1). Even assuming that aiding and abetting securities fraud *can* be a RICO predicate act, we find the record support for such a claim to be lacking, as we do with respect to the plaintiffs' allegations that RIHT engaged in mail or wire fraud.

As for the aiding and abetting allegation, we agree with the district court that the record contains not a scintilla of evidence that would support the requisite finding that RIHT "consciously shared" in the principal wrongdoer's (Laurel's) specific intent to defraud the plaintiffs. *See United States v. Loder,* 23 F.3d 586, 590–91 (1st Cir.1994) (describing the elements of criminal aiding and abetting). The lack of evidence of fraudulent intent on the part of RIHT similarly dooms plaintiffs' allegations that the bank committed mail or wire fraud. There is no basis in the record from which a rational

trier of fact could conclude that the mailings or wires by RIHT (described in the plaintiffs' brief in only a fleeting fashion) constituted communications "in furtherance" of a scheme *"intended to deceive another,* by means of false or fraudulent pretenses, representations, promises, or other *deceptive conduct." McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.) (emphases added), *cert. denied,* 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990). .

We conclude that the record contains insufficient evidence to raise a triable issue as to whether RIHT committed any of the RICO predicate acts alleged by the plaintiffs.

## B. The "Pattern" Requirement

■ The plaintiffs' RICO claims fail for an additional, independent reason. For the plaintiffs to prevail, they must establish not only that RIHT engaged in some "racketeering activity," but that the bank's conduct constituted a "pattern" of such activity. *See* 18 U.S.C. § 1962(b)–(c). The RICO statute by its terms specifies that a "pattern" entails at least two predicate racketeering acts. *See* 18 U.S.C. § 1961(5). However, while two predicate acts are necessary to form a RICO "pattern," they may not be sufficient unless they are both "related" and "amount to or pose a threat of continued criminal activity." *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239–40, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989); *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 444 (1st Cir.1990). "In other words, a RICO pattern consists of 'continuity plus relationship.'" *Sousa v. BP Oil, Inc.,* 1995 WL 842003, *13 (D.Mass.1995) (quoting *H.J.,* 492 U.S. at 239, 109 S.Ct. at 2900–01).

This court has remarked upon the elusiveness of any helpful, talismanic definition of a RICO "pattern." *See Apparel Art Int'l Inc. v. Jacobson,* 967 F.2d 720, 722 (1st Cir.1992). But, as then-Chief Judge Breyer explained, courts have consistently held that a "single episode" of criminal behavior, even if it involves the commission of multiple related acts, does not constitute a "pattern." *See id.* at 723. Instead, courts have tended to find RICO "patterns" only where the defendant's

conduct consists of "multiple criminal episodes" extending over long periods of time. *Id.* at 724; *see also H.J.*, 492 U.S. at 242, 109 S.Ct. at 2902 ("Congress was concerned in RICO with long-term criminal conduct.").

■ Here, the alleged instances of wrongful conduct by RIHT all constituted part of a *single* "episode." Like the multiple predicate acts that were described in *Apparel Art* as "compris[ing] a single effort" to achieve one goal (obtaining and keeping a Defense Department contract), *see* 967 F.2d at 723, the alleged racketeering acts attributed to RIHT in this case, "taken together, ... comprise a single effort" to facilitate a single financial endeavor: the purchase and renovation of the Sea Crest resort. *Id.*

If the mailings and wires RIHT transmitted in the course of its involvement in the Sea Crest offering could amount to a RICO "pattern," then virtually every claim asserted under the federal securities laws could spawn a companion RICO cause of action, because "[i]n today's integrated interstate economy, it is the rare transaction that does not somehow rely on extensive use of the mails or the telephone." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 31 (1st Cir.1987) (internal quotation omitted). We conclude that the instances of RIHT's conduct identified by plaintiffs as constituting RICO predicate acts did not form a "pattern" of racketeering activity and are more "appropriately characterized as separate parts of a single [allegedly] criminal episode." *Apparel Art*, 967 F.2d at 723.

## VI.

### *Conclusion*

The three separate judgments entered by the district court in these consolidated cases are *affirmed.*