UNITED STATES, Appellee,

v.

Ramiro L. COLON–MUNOZ, Defendant, Appellant.

No. 998–1684.

United States Court of Appeals, First Circuit.

Heard April 6, 1999.

Decided Oct. 1, 1999.

212

Jorge E. Vega–Pacheco, Assistant Unit-
ed States Attorney, with whom Guillermo

Gil, United States Attorney, Nelson Pérez–Sosa, Assistant United States Attorney, Elizabeth D. Collery, Attorney, Appellate Section, Criminal Division and James K. Robinson, Assistant Attorney General, Criminal Division, were on brief for appellee.

Peter Goldberger, with whom Jan Armon, Ellen C. Brotman, Pamela A. Wilk, and María H. Sandoval were on brief for appellant Colón.

Before LYNCH, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

LIPEZ, Circuit Judge.

We consider in this appeal criminal convictions relating to a real estate transaction in Puerto Rico in the 1980s. The defendant, Ramiro L. Colón–Muñoz, formerly President of Ponce Federal Bank, was convicted of misapplication of bank funds (five counts), bank fraud, making a false entry on a loan document, making a false statement on a loan application, fraudulently benefitting from a bank loan, and conspiracy. The real estate at issue, a farm called La Esmeralda ("the farm" or "La Esmeralda") was also forfeited. Colón now raises a variety of objections to the convictions and forfeiture, beginning with the claim that his indictment was invalid because of interim United States Attorney Guillermo Gil's participation before the grand jury pursuant to an unconstitutional judicial appointment. Colón also challenges the sufficiency of the evidence to support his convictions and claims that the forfeiture of La Esmeralda violated the Ex Post Facto Clause of the United States Constitution.

Although we conclude that Colón waived his challenge to the validity of the indictment, we agree that there was insufficient evidence to support his convictions on four of the five misapplication counts and the false statement count, and that the forfei-

ture of the real estate violates the Ex Post Facto Clause of the Constitution. We affirm the convictions on one count of misapplication, and on the counts of bank fraud, false entry, fraudulently benefitting from a bank loan, and conspiracy.

## I. Background

We have already considered many of the issues at hand in the appeal of Colón's codefendant, José Blasini–Lluberas. As the scheme at issue was set forth in great detail in our opinion in that case, *United States v. Blasini–Lluberas*, 169 F.3d 57, 60–62 (1st Cir.1999), we offer here a limited statement of the facts which the jury could have found from its review of the evidence, supplemented by the specifics of Colón's involvement where necessary.

On July 15, 1987, Colón and his wife purchased La Esmeralda from thirteen members of the Usera family who had inherited the farm. Colón paid $83,340 at the closing and the balance of $472,260 was due nine months later on April 14, 1988.[1] As security for the balance of the purchase price, Colón granted the Usera family a mortgage on the property.

Following Colón's purchase of the farm, but prior to the due date of Colón's outstanding $472,260 obligation, four members of the Usera family approached Colón requesting money.[2] Each family member had a specific reason for requesting a loan but, generally speaking, the family members were seeking funds to satisfy obligations unrelated to the sale of the farm. Colón agreed to help them, sending the family members to see Blasini, then an executive vice-president of Ponce Federal Bank ("the bank"), and instructing him to assist each of them in securing a loan from the bank. As vice-president of the bank, Blasini was authorized to approve unsecured loans up to $50,000 and secured

---

**1.** Each of the thirteen members of the family was owed a pro rata share of the purchase price according to each member's inheritance share.

**2.** The four family members were Monseratte Usera, Ana Usera, Carmen Maduro Usera and Vicente Usera Tous.

loans up to $100,000. Blasini authorized the loans, ranging from $11,000 to $20,000, subject to a standard rate of interest and a due date. None of the loan applications included a financial statement or credit history. Each family member, however, executed partial assignments of their mortgage interests in the farm as security for the loans. Although the partial assignments were signed by both Blasini ·and Colón, they were not included in the loan file. The stated purpose for the loans was personal; the means of repayment was the sale of a farm. Because the loans did not exceed $50,000, their approval did not require collateral as a matter of bank policy.

When Colón's debt to the Usera family came due on April 14, 1988, he was unable to satisfy his obligation. On April 19, 1988, another member of the Usera family, Consuelo García–Gomez, went to the bank and demanded payment of her share of the purchase price. Consuelo García–Gomez was entitled to $200,000, the largest share of the inheritance. Wendell Colón, Colón's brother, told Consuelo García–Gomez that the money was not immediately available. She then asked for $100,000. Thereafter, Blasini brought Consuelo García–Gomez to a loan officer and instructed the officer to disburse a $100,000 loan to her. The information in her loan application was provided to the loan officer by Blasini and the application stated that collateral for the loan was a partial assignment of Consuelo García–Gomez's mortgage interest in the farm. The listed purpose of the loan was the purchase of an apartment. On the loan application, directly above Blasini's signature, Blasini wrote,[3] "discussed and agreed to by attorney R.L. Colón." [4] At trial Consuelo García–Gomez explained that, although she signed loan documents to receive the $100,000, she did not go to

the bank for the purpose of obtaining a loan and she never read the loan documents before signing them. She maintained that the $100,000 was partial payment of the money owed to her rather than a loan.

On May 13, 1988, Colón paid the balance of the purchase price of the farm to the Useras. Colón wrote two sets of checks from his personal account. The first set paid off the bank loans of Monserrate Usera, Ana Usera, Carmen Maduro, Vicente Usera and Consuelo García–Gomez. He listed the appropriate amount of their outstanding debts, including the interest that had accrued, and named both the bank and the borrower as joint payees. The second set of checks paid each family member the balance of what he or she was owed. They then signed a cancellation of the mortgage.

When members of the Usera family presented the checks at the bank for immediate payment, Colón's personal account had insufficient funds to pay all of the checks. Blasini authorized a bank officer to substitute official bank checks for Colón's personal checks. The official bank checks were debited against Colón's personal checking account. At the close of business on May 13th, Colón's personal account was overdrawn by $122,930.

The following business day, May 16, Colón deposited $492,394 in his personal account from the proceeds of a $500,000 loan he obtained from the Royal Bank of Puerto Rico ("Royal Bank"). A month before, in April, Colón had applied for the loan, initially contacting the Vice President of Royal Bank by phone to discuss the possibility of such a loan. Notwithstanding the fact that in April the Useras still had a mortgage on the farm, Colón and his wife prepared a mortgage deed which stated

**3.** Precisely when Blasini made this notation is uncertain. *See infra.*

**4.** At trial, Marisel Marrero, the assistant bank manager who identified this notation as Blasini's, read the name in the notation as "R.C. Colón," apparently reading a curved "L" as a "C." Marrero made clear, however, that she

was referring to the president of the bank and defendant in this case, Ramiro L. Colón, and we refer here to his correct name in quoting the notation. In *Blasini–Lluberas,* 169 F.3d at 61–62, we rendered the statement as Marrero read it.

that Royal Bank was granted a first mortgage on La Esmeralda. The mortgage deed was filed at the registry of deeds on April 19, 1988. However, in the financial documents submitted to Royal Bank, the Usera family's pre-existing first mortgage on the property was fully disclosed. The loan was approved on May 4th but was not actually disbursed until May 16th, three days after the Useras released their mortgage on the farm.

Two years later, in August of 1990, Colón received a severance package from Ponce Federal Bank in the amount of $615,500. With those monies, he paid off the balance of his loan from Royal Bank.

In 1995, Colón was indicted on multiple counts relating to these transactions. Following a trial, Colón was convicted on five counts of misapplication of bank funds under 18 U.S.C. § 657, one count of bank fraud under 18 U.S.C. § 1344, one count of false entry under 18 U.S.C. § 1006, one count of benefitting, directly or indirectly, from the loan transactions in question under 18 U.S.C. § 1006, one count of false statement under 18 U.S.C. § 1014, and one count of conspiracy under 18 U.S.C. § 371. The jury also returned a verdict of forfeiture as to Colón's interest in La Esmeralda under 18 U.S.C. § 982(a)(2).

Colón filed a post-trial motion for a judgment of acquittal under Fed.R.Crim.P. 29(c), challenging the sufficiency of the evidence and, for the first time, the validity of the indictment because of interim United States Attorney Guillermo Gil's participation before the grand jury. He argued that Gil's judicial appointment was unconstitutional and sought discovery on the circumstances of the appointment. The motion for discovery and the motion for a judgment of acquittal were denied.

Colón was sentenced to twenty-one months imprisonment followed by two years of supervised release. He was also fined $20,000 and his interest in La Esmeralda was forfeited.

## II. The Appointment of the Interim United States Attorney

■ As noted, Colón raised for the first time in his motion for a judgment of acquittal a claim that Guillermo Gil's judicial appointment as the interim United States Attorney for the District of Puerto Rico was constitutionally invalid.[5] Specifically, he maintained that 28 U.S.C. § 546(d), which allows the district court to appoint an interim United States Attorney, violates both the Appointments Clause of the United States Constitution, art. II, § 2, cl. 2, and the principles of separation of powers. On the basis of this alleged constitutional violation, Colón argued that Gil's participation in the grand jury proceedings that led to Colón's indictment violated Fed. R.Crim.P. 6(d), which provides that only attorneys for the government may be present while the grand jury is in session. Because Gil was improperly appointed, Colón argued that Gil was not an attorney for the government who was authorized to be present before the grand jury. On appeal, Colón reasserts this argument and seeks the dismissal of the indictment.

We do not reach the merits of Colón's claim. The rules unmistakably require that "objections based on defects in the institution of the prosecution" or "defects in the indictment ... must be raised prior to trial." Fed.R.Crim.P. 12(b). Colón first raised his constitutional objection to Gil's participation before the grand jury in his post-trial motion for a judgment of acquittal. Although the rules permit a defendant to show "cause" for his failure

**5.** On May 3, 1993, Attorney General Reno appointed Assistant United States Attorney Charles Fitzwilliams to be interim United States Attorney pursuant to her authority under 28 U.S.C. § 546(a). The President did not nominate and appoint another candidate within 120 days and Fitzwilliams' appointment expired on September 4, 1993. On September 9, 1993, the District Court of the District of Puerto Rico appointed Guillermo Gil as the interim United States Attorney pursuant to its authority under 28 U.S.C. § 546(d). As of this appeal, Gil remains the interim United States Attorney.

to raise his objections pre-trial, see Fed. R.Crim.P. 12(f) ("the court for cause shown may grant relief from the waiver"), Colón's showing is unpersuasive.

Colón protests that he only learned of Gil's involvement in the grand jury proceedings through the Jencks Act materials he received during the trial.[6] Nonetheless, he failed to file any objections at the time he received the Jencks material, waiting instead for a jury verdict and the filing of his motion for a judgment of acquittal. Moreover, Colón was well aware of Gil's personal involvement in this case pre-trial. Defense counsel met personally with Gil on one occasion and phone calls and letters were exchanged relating to trial preparation and discovery issues. Gil's name appeared on the indictment.[7] Despite these facts, Colón did not seek any pre-trial discovery to investigate the nature of Gil's participation in the grand jury proceedings pursuant to the procedures set forth in Fed.R.Crim.P. 6(e)(3)(C)(i),(ii).[8] Under these circumstances, we conclude that Colón has not demonstrated cause for his failure to raise his objection pre-trial and we will not grant relief from his waiver.

■ In an effort to escape the consequences of waiver, Colón argues that his challenge to the appointment of the interim United States Attorney on the basis of the Appointments Clause of the United States Constitution and separation of powers principles is jurisdictional and cannot be waived. *See* Fed.R.Crim.P. 12(b)(2) (objections "that [the indictment] fails to show jurisdiction in the court ... shall be noticed by the court at any time during the pendency of the proceedings"). We disagree with Colón's characterization of his claim.

In *Freytag v. Commissioner of Internal Revenue,* 501 U.S. 868, 878, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), the Supreme Court recognized that a challenge under the Appointments Clause to the propriety of a statute which permitted the judicial appointment of special trial judges in the Tax Court raised both "structural" and "political" concerns. Notwithstanding the structural and political implications of the underlying claim, the Court characterized it as nonjurisdictional. *See id.* at 878–79, 111 S.Ct. 2631; *see also Glidden Co. v. Zdanok,* 370 U.S. 530, 535–36, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962)(including Appointments Clause objections to judicial officers in the category of nonjurisdictional structural constitutional objections).[9] Al-

---

6. Pursuant to the Jencks Act, 18 U.S.C. § 3500, a defendant is entitled to government documents for assistance in cross-examining witnesses in order to impeach them for prior inconsistent statements.

7. Although Gil's name appeared on the indictment, the indictment was actually signed by Assistant United States Attorney Vega.

8. Rule 6 provides in pertinent part:
 Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—
 (i) when so directed by a court preliminarily to or in connection with a judicial proceeding;
 (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

9. As used in cases like *Freytag* and *Glidden,* the word "structural" literally refers to the structure of the federal government as envisioned in the Constitution. For example, the Court writes in *Freytag:* "The roots of the separation-of-powers concept embedded in the Appointments Clause are structural and political. Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch." *Freytag,* 501 U.S. 868, 878, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). In a case such as *Neder v. United States,* — U.S. —, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), applying a harmless error analysis to a jury instruction that omitted an element of the offense, the word "structural" has a different meaning. There it refers to those constitutional errors, present in "a very limited class of cases," *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), which "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment

though the challenge in *Freytag* concerned the judicial appointment of other judges, and the challenge in this case concerns the judicial appointment of an interim United States Attorney, we see no basis for characterizing this claim differently. The *Freytag* Court accepted the proposition that "[t]he alleged defect in the appointment ... goes to the validity of the [court] proceeding." *Id.* at 879, 111 S.Ct. 2631. Colón made a similar claim here. His challenge to the constitutionality of Gil's appointment as interim United States Attorney was a nonjurisdictional claim and it was waived. *Cf. United States v. Gantt*, 179 F.3d 782, 786–87 (9th Cir.1999) ("An infirmity in the United States Attorney's appointment would not generally affect the jurisdiction of this court so long as a proper representative of the government participated in the action.... [T]he constitutionality of § 546(d) would not affect the validity of indictments ... as indictments need only be signed by an attorney for the government.").[10]

We have used the term "waiver" in evaluating the timeliness of Colón's challenge to Gil's participation before the grand jury because Rule 12(f) uses that term. Pointing to the use of that term in Rule 12, the government, relying on *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) notes that "waiver" is different from "forfeiture." Since waiv-

er extinguishes plain error review, the government argues, and since Rule 12(f) refers to waiver, the government contends that the rule itself precludes plain error review here.

■ We need not resolve this issue given the Supreme Court's decision in *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), concluding that alleged violations of Rule 6(d), not raised pre-trial, are rendered harmless as a matter of law by a subsequent guilty verdict at trial. Colón's constitutional objections to Gil's appointment are the predicate for his claim that Gil's presence before the grand jury violated Rule 6(d).[11] As a remedy for this error, Colón asks for dismissal of the indictment. *Mechanik* precludes any such relief.

In *Mechanik*, two government witnesses testified in tandem before the grand jury, which ultimately indicted both defendants on various drug related offenses. *See id.* at 67, 106 S.Ct. 938. At trial, once the defendants learned of the alleged violation, the defendants objected to the joint presence of the two witnesses and moved for a dismissal of the indictment on the basis that the "simultaneous presence of the two agents had violated Federal Rule of Criminal Procedure 6(d)." *Id.* at 68, 106 S.Ct. 938. The district court took the motion under advisement. Following a guilty ver-

---

may be regarded as fundamentally fair.'" *Neder*, 119 S.Ct. at 1833 (quoting *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)). Such structural errors include complete denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, or a defective reasonable doubt instruction. *See id.* The alleged "structural" error at issue in this case involves the structure of the federal government rather than the structure of the criminal trial process as a reliable means of determining guilt or innocence. Some of the arguments advanced on behalf of Colón relating to the interim judicial appointment of the United States Attorney blur these different meanings of "structural."

**10.** As noted, Assistant United States Attorney Vega signed the indictment and participated fully throughout Colón's trial.

**11.** Colón confirms in his supplemental post-argument reply brief that his argument about the unconstitutionality of Gil's appointment is available to him only because of Gil's participation in the grand jury proceedings that led to his indictment, and hence, as he sees it, the violation of grand jury rules. Colón states that he "has never suggested that the present issue is properly available to any defendant indicted in the district, or even in every case in which Mr. Gil has set foot inside a grand jury room." The arguments raised by the National Association of Criminal Defense Lawyers (the "Association") in its amicus brief seem to have these larger implications disclaimed by Colón.

dict, the district court denied the motion on the basis that, notwithstanding any violation of Rule 6(d), there had been no harm to the defendants given the subsequent guilty verdict. The Supreme Court agreed with the district court's reasoning, concluding that "however diligent the defendants may have been in seeking to discover the basis for the claimed violation of Rule 6(d), the petit jury's verdict render[s] harmless any conceivable error in the charging decision that might have flowed from the violation." *Id.* at 73, 106 S.Ct. 938. The Supreme Court explained its reasoning:

> The rule protects against the danger that a defendant will be required to defend against a charge for which there is no probable cause to believe him guilty. The error involving rule 6(d) in these cases had the theoretical potential to affect the grand jury's determination whether to indict these particular defendants for the offenses with which they are charged. But the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70, 106 S.Ct. 938 (citation omitted).

*Mechanik*'s reasoning applies to this case. As a matter of law, any error in the charging decision of the grand jury was rendered harmless by the verdict and Colón cannot claim that Gil's presence before the grand jury entitles him to a dismissal of the indictment.[12] We caution, however,

that this conclusion implies no judgment about the importance of the issues raised by Colón or the Association in their challenge to the constitutionality of the lengthy interim judicial appointment of the United States Attorney. Aided by the long and thoughtful brief of the Association, they claim, as already noted, that 28 U.S.C. § 546(d) is unconstitutional on Appointments Clause and separation of powers grounds, and claim further that § 546(d) is unconstitutional as applied because the district court's interim appointment of Gil has become de facto permanent. These are serious issues. Timely raised, they would merit careful attention.

## III. Sufficiency of the Evidence

■ We turn to a discussion of the challenges to the sufficiency of the evidence. In evaluating such claims, we review the evidence as a whole, together with all reasonable inferences therefrom, in a light most favorable to the government. *See United States v. Mangual–Corchado*, 139 F.3d 34, 44 (1st Cir.1998). Viewing the evidence in this light, "[w]e review de novo the district court's determination that the jury reasonably found 'each element of the crime to have been proven beyond a reasonable doubt.'" *Id.* (quoting *United States v. Houlihan*, 92 F.3d 1271, 1295 (1st Cir.1996)). Where "an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence" we must reverse a conviction. *Blasini–Lluberas*, 169 F.3d at 62 (alteration omitted).

### A. Misapplication of bank funds (Counts Two through Six)[13]

■ We conclude, as we did in *Blasini–Lluberas, see id.,* that there was insuffi-

---

**12.** To the extent that Colón raises objections to Gil's participation at trial, we review such claim for plain error given Colón's failure to raise any such objection at trial. *See* Fed. R.Crim.P. 52(b). Colón makes no specific objection to Gil's actual participation at trial, other than the alleged error in his appointment. That is, he does not even try to demon-

strate that Gil's participation "affected the outcome of the district court proceedings," as required by *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). This failure defeats any claim of plain error.

**13.** The statute provides in pertinent part:

cient evidence from which a reasonable jury could conclude that the loans to Ana Usera, Monserrate Usera, Carmen Maduro Usera and Vicente Usera Tous constituted a criminal misapplication of bank funds. *See id.* at 62–64. Given our conclusion in *Blasini–Lluberas* that there was sufficient evidence to convict Blasini on the count of misapplication relating to Consuelo García–Gomez, we must consider whether there was also sufficient evidence to convict Colón of that offense.

■ As discussed in detail in *Blasini–Lluberas*, when Consuelo García–Gomez went to Ponce Bank in April 1988 and demanded payment, Colón's $200,000 debt to her was past due. She did not request a loan. At the bank she initially met with Colón's brother who informed her that the money was unavailable. She suggested payment of $100,000. Thereafter, Blasini took Consuelo García–Gomez to meet with Marisel Marrero, the assistant bank manager,[14] and instructed her on the details of the loan application. *See id.* A $100,000 loan was then disbursed to Consuelo García–Gomez that day. The notation on the loan application admitted in evidence read "discussed and agreed to by attorney R.L. Colón."

Although the loans to the four other Usera family members were not misapplication of bank funds, Colón was "playing it close to the line" in his dealings with them. *Id.*, 169 F.3d at 64. When Consuelo García–Gomez arrived at the bank demanding payment of the already-matured debt, the jury could have reasonably concluded that

Colón crossed the line by deceptively using Ponce Bank funds to satisfy his private debt under the guise of a bank loan to a woman who did not want a loan. The notation Blasini included on Consuelo García–Gomez's loan application, "discussed and agreed to by attorney R.L. Colón," provided ample evidence from which the jury could infer that Colón was personally involved in the illegal transaction with Consuelo García–Gomez, just as he had been personally involved in arranging the loans to other members of the Usera family with the help of Blasini. This wrongful use of bank money to satisfy a private debt, carried out with an intent to deceive the bank about the true nature of the transaction, involved all of the essential elements of the crime of misapplication.

On appeal, Colón argues that Blasini's notation on Consuelo García–Gomez's loan document did not appear until a month after the loan was processed, and hence there was insufficient evidence of his involvement in the loan. We disagree. The jury could have reasonably concluded that Blasini accurately recorded Colón's contemporaneous involvement in the loan even if Blasini's notation was subsequent in time. Considering the totality of the circumstances, there was sufficient evidence to convict Colón for the misapplication of bank funds on Count Six.

## B. Bank fraud[15] (Count Seven)

■ To establish bank fraud pursuant to 18 U.S.C. § 1344,[16] the government

---

Whoever, being an officer, agent or employee of [a] savings and loan corporation or association authorized or acting under the laws of the United States ... embezzles, abstracts, purloins or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution [is guilty of misapplication of bank funds].
18 U.S.C. § 657.

**14.** In *Blasini–Lluberas*, we referred to Ms. Marrero as a loan officer.

**15.** 18 U.S.C. § 1344 provides in pertinent part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—
 (1) to defraud a financial institution; or
 (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises ... [is guilty of bank fraud].

**16.** As we did in *Blasini–Lluberas*, we refer to the relevant statutes in their current form throughout this opinion. Although each of the relevant statutes has been amended since the date of the commission of the alleged

must establish that the defendant (1) engaged in a scheme or artifice to defraud or made false representations to obtain money from (2) a financial institution and (3) did so knowingly. A scheme or artifice to defraud is defined to include "any plan, pattern or [course] of action ... intended to deceive others in order to obtain something of value." *United States v. Brandon*, 17 F.3d 409, 424 (1st Cir.1994) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987)). The evidence was sufficient for the jury to conclude that Colón, with the assistance of Blasini, knowingly engaged in a scheme to obtain bank funds, deceitfully characterized as a loan, to satisfy $100,000 of his outstanding obligation to Consuelo García–Gomez. The structuring of the transaction as a loan was the scheme to defraud. Further, as with the misapplication count, the notation on the back of the loan documents sufficiently demonstrates Colón's specific involvement in the sham loan transaction.[17]

After Colón was sentenced and his appeal submitted to us, the Supreme Court determined that materiality is an element of the fraud perpetrated by "a scheme or artifice" under 18 U.S.C. § 1344. *See Neder v. United States*, —— U.S. ——, 119 S.Ct. 1827, 1839, 144 L.Ed.2d 35 (1999). Not having had the benefit of *Neder*, the district court did not instruct the jury that in order to convict it had to find that the "scheme or artifice to defraud" involved material falsehoods. Because this rule was announced while Colón's conviction was on direct appeal, the newly-announced rule applies to his appeal. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the rule constitutes a 'clear break' with the past"). We review the district court's omission of the materiality element for plain error because Colón did not claim that materiality was an element before the district court. *See Johnson v. United States*, 520 U.S. 461, 465–66, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). We apply this standard even though there has been a change in the law since trial and defense counsel's failure to object was appropriate at the time. *See id.; see also United States v. Collins*, 60 F.3d 4, 7 (1st Cir.1995) (applying plain error review to claim raised for the first time on appeal even when failure to object "most likely was based on counsel's correct understanding of the law at the time").[18]

Before we can correct an error pursuant to the plain error standard, we must conclude that there was error, that the error was plain and that the error affected substantial rights. *Johnson*, 520 U.S. at 466–67, 117 S.Ct. 1544 (citing *Unit-*

---

crimes, the amendments do not bear directly on the issues on appeal. For the most part, changes to the statutes concerned punishment for—not elements of—the offense. Of course, for the purposes of sentencing on remand, the statutes as they appeared at the time of the offense control.

**17.** As we explained in *Blasini–Lluberas*, we will not vacate the bank fraud conviction on the basis of our conclusion that four of the five loans were legitimate. The government charged one count of bank fraud based on five separate loan transactions, each of which could have served as the basis for the fraud allegation. *See Blasini–Lluberas*, 169 F.3d at 65; *Brandon*, 17 F.3d at 422. So long as there was sufficient evidence from which a jury could conclude that one of the transac-

tions constituted bank fraud, the conviction stands.

**18.** Oddly, neither party has availed itself of Rule 28(j) of the Federal Rules of Appellate Procedure permitting the parties to cite "pertinent and significant authorities" that come to a party's attention after oral argument but before decision. That rule, however, only permits a party to state "without argument the reasons for the supplemental citations." Given the importance of the materiality issue to the fair disposition of the bank fraud conviction, the limited scope of a Rule 28(j) filing, and our own awareness of the relevant authority, we deem it appropriate to address the materiality issue even though the parties did not bring the *Neder* case to our attention.

*ed States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). If these three conditions are met, we "may then exercise [our] discretion to notice a forfeited error, but only if the error ... seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467, 117 S.Ct. 1544 (internal quotation marks omitted).

■ In light of *Neder,* there is no doubt that the court's instruction on bank fraud, omitting any reference to materiality, was an error and that such error was plain. In *Johnson,* the Supreme Court held that where the law at the time of trial is contrary to the law at the time of the appeal, "it is enough that an error be 'plain' at the time of appellate consideration." *Id.* at 468, 117 S.Ct. 1544.

■ The requirement under Rule 52(b) that the plain error "affect substantial rights" has been interpreted to mean that "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano,* 507 U.S. at 734, 113 S.Ct. 1770. This standard is substantially the same as the standard applied in a harmless error analysis under Rule 52(a), except that "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.* Colón's deception about the sham loan to Consuelo García-Gomez was material in the relevant sense, i.e., a "reasonable man would attach importance to [it] in determining his choice of action in the transaction in question." *Neder,* 119 S.Ct. at 1840 n. 5 (quoting

Restatement (Second) of Torts § 538 (1976)). Officials at the bank reviewing this transaction would undoubtedly be influenced in their view of its appropriateness by Colón's deception about Consuelo García-Gomez's demand for payment of his overdue debt. At the very least, Consuelo García-Gomez's anger about Colón's ploy, described by witnesses at the trial, created the risk that she would refuse to treat the loan transaction contrived by Colón as a loan. Colón's deception about the purpose of the loan to Consuelo García-Gomez was inescapably material, and hence, like the Supreme Court in *Neder,* we conclude beyond a reasonable doubt that the jury verdict on the bank fraud count would have been the same even if the court had given an instruction on materiality.

## C. False entry (Count Eight)[19]

■ Colón was charged with making a false entry with the intent to defraud a banking institution in violation of § 1006. The statute provides that any employee of an insured bank who makes a false entry in any statement to such institution with the intent to defraud such institution commits a violation. *See* 18 U.S.C. § 1006.[20] In *Blasini–Lluberas,* we assumed arguendo that materiality is an element of the crime of false entry and concluded that there was sufficient evidence for a reasonable jury to decide that Blasini had made a material false entry on Consuelo García-Gomez's loan application by stating to Marisel Marrero, the bank officer who prepared the documentation for Consuelo

**19.** 18 U.S.C. § 1006 provides in pertinent part:

> Whoever, being an officer [of a federally insured banking institution] ... with intent to defraud any such institution ... or to deceive any officer, auditor, examiner or agent of any such institution ... makes any false entry in any book, report or statement of or to any such institution ... [is guilty of a crime].

**20.** As we discussed in *Blasini–Lluberas,* although the general parameters of § 1006 are clear, the Supreme Court has yet to decide

whether "materiality" is an element of this statute: that is, whether the government must show that the defendant knowingly and willfully made or caused to be made a false entry concerning a *material fact* in any statement to the institution. *See United States v. Parks,* 68 F.3d 860, 865 (5th Cir.1995) (holding that materiality is an element of 18 U.S.C. § 1006). *But Cf. United States v. Harvard,* 103 F.3d 412, 417–20 (5th Cir.1997) (holding that materiality is not an element of 18 U.S.C. § 1005, a nearly identical statute).

García–Gomez's loan, that the purpose of her loan was the purchase of an apartment. *See Blasini–Lluberas,* 169 F.3d at 66.

Colón did not fill out Consuelo García–Gomez's loan application, nor was he present when the notation was made on the document. This absence of direct participation by Colón does not end the analysis, however. Colón and Blasini were charged with aiding and abetting[21] each other in making a false entry on a loan document. A defendant is guilty of aiding and abetting where the government can show that (1) "the principal committed the underlying substantive crime" and (2) "the defendant associated himself with the venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." *United States v. Loder,* 23 F.3d 586, 590–91 (1st Cir.1994). "It is well settled that a culpable aider and abetter need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution." *United States v. Garcia–Rosa,* 876 F.2d 209, 217 (1st Cir.1989), *vacated on other grounds sub nom. Rivera–Feliciano v. United States,* 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990). Moreover, the government "need not preclude every reasonable hypothesis in order to sustain a conviction," and may prove its case through circumstantial evidence. *Loder,* 23 F.3d at 591.

Accordingly, even though Blasini actually caused the making of the false entry on the loan application about the apartment, Colón too may be punished for false entry if he is guilty of aiding and abetting Blasini in that effort. The transaction with Consuelo García–Gomez on April 19, 1988, was unusual. Marisel Marrero, the assistant bank manager, testified that she could not recall a $100,000 loan that was disbursed the same day the loan application was received. That application process began with a handwritten loan application for which Blasini provided the information. That information included the statement that the purpose of the loan was the purchase of an apartment. This handwritten copy was then typed up. Apparently there was a problem with the review of the loan documentation within the bank, and the loan department sent the file back on May 9 for further documentation, including an indication of Blasini's approval of the loan. On May 11, an unidentified bank official responded with a written memorandum indicating that the loan had been approved by Blasini on April 19, orally and by signature, and that the original documents were being sent to him to sign. According to Colón, the document with the comment by Blasini asserting that the loan with Consuelo García–Gomez had been "discussed and agreed to by attorney R.L. Colón" was not received back at the loan department until May 17.[22]

**21.** 18 U.S.C. § 2 provides in relevant part that:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**22.** The information set forth in the above paragraph is drawn largely from documents introduced into evidence in Spanish which were not translated. Colón discusses these documents at length in his reply brief in an apparent effort to distance himself from Blasini's actions in extending the sham loan to Consuelo García–Gomez. In using these documents, Colón notes that they do not comply with our local rule 30.7 which states that "the court will not receive documents not in the English language unless translations are furnished." Despite the wording of the rule, we retain discretion to waive the requirements of the rule in appropriate circumstances. *See Rivera–Gomez v. de Castro,* 843 F.2d 631, 634 n. 4 (1st Cir.1988). Given Colón's extensive reliance on these documents in the reply brief, and given the relative ease of understanding those documents without the benefit of a translation, we deem it appropriate to consider these portions of the record on appeal. As it happens, despite Colón's arguments, we find these documents more inculpatory than exculpatory.

Although there is uncertainty in the record about precisely when Blasini added the notation about the discussion with and agreement of Colón, we have already noted that a jury could have reasonably concluded that Blasini accurately recorded Colón's contemporaneous involvement in the loan with Consuelo García–Gomez even if Blasini's notation was subsequent in time. A jury could further infer that the false entry had been specifically discussed with Colón for three reasons. The bank form for the loan required that a statement of purpose be given for a loan of this size. It is a fair inference that Colón, as president of the bank, was aware of that requirement. Secondly, this purported loan to Consuelo García–Gomez was in fact a sham transaction, designed to pay off a portion of Colón's debt to García–Gomez. That purpose obviously could not be stated. Colón and Blasini would have anticipated the need to contrive some other statement of purpose. Third, the notation is on the second page of a document containing the false entry and it is reasonable to conclude that Blasini and Colón discussed that same document. Under these circumstances, a reasonable jury could conclude beyond a reasonable doubt that Colón associated himself with Blasini in the venture to make a false entry on Consuelo García–Gomez's loan application and that he sought by his actions to make this illegal act succeed. *See United States v. Loder,* 23 F.3d 586, 590–91 (1st Cir.1994).

### D. Fraudulently benefitting from a loan (Count Nine)[23]

▮▮▮ Colón claims that there was insufficient evidence from which a jury could convict him of improper participation in the loan to Consuelo García–Gomez in violation of § 1006. To convict on this crime, the government must demonstrate "(1) the defendant's connection with a protected institution; (2) direct or indirect receipt of some benefit from a bank transaction; and (3) intent to defraud." *United States v. Brechtel,* 997 F.2d 1108, 1115 (5th Cir.1993). In *Brechtel,* the court explained that "a fiduciary who benefits ... by knowingly subordinating the institution's interests to his own in a transaction for which he has responsibility acts with the 'intent to defraud' required by § 1006." *Id.* at 1116. The government can demonstrate an intent to defraud through circumstantial evidence. *See id.* "An inference of intent to defraud arises where a responsible bank insider acts to procure a transaction which he knows will benefit him, without disclosing his interest therein." *Id.*

As President of the bank, Colón was obviously connected with the financial institution. The sham loan to Consuelo García–Gomez was of great benefit to him. His debt to her was outstanding and he was able to use bank funds to make a partial payment to her. His prior involvement with the family and the notation on the back of the loan document demonstrate his involvement in the transaction even though he was not present at the time the loan was signed. As noted in *Brechtel,* a jury may infer Colón's attempt to defraud the bank from the fact that he acted to "procure a transaction which he [knew would] benefit him, without disclosing his interest therein" to the bank. *Id.* at 1116. There was sufficient evidence to support his conviction for fraudulently benefitting from the loan to Consuelo García–Gomez in violation of § 1006.

### E. False statement (Count Eleven)[24]

▮▮▮ Colón was convicted of making a false statement in violation of 18 U.S.C.

---

**23.** 18 U.S.C. § 1006 provides in pertinent part:

"Whoever, being an officer [of a federally insured banking institution] ... with intent to defraud ... any corporation, institution or association referred to in this section, participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of such corporation ... [is guilty of a crime]."

**24.** 18 U.S.C. § 1014 provides in relevant part:

§ 1014 relating to the $500,000 loan he obtained from Royal Bank in 1988. In order to convict for a violation of 18 U.S.C. § 1014 in this context, the government must prove that (1) the defendant made or caused to be made a false statement or report to a bank in a loan application, (2) that the defendant acted knowingly and (3) that the false statement was made for the purpose of influencing the bank's actions on the loan. *See United States v. Concemi*, 957 F.2d 942, 951 (1st Cir.1992). The false statement need not be material, *see United States v. Wells*, 519 U.S. 482, 489–99, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), but the statement must be "for the purpose of influencing in any way the action of the [bank]." 18 U.S.C. § 1014.

The government alleged that Colón made a false statement on a mortgage deed to the farm that was filed at the registry of deeds on April 19, 1988, one month prior to the issuance of the $500,000 loan. The mortgage deed did not mention the Usera's existing mortgage on the farm, stating instead that Royal Bank was granted a first mortgage on the farm. By way of defense, Colón argues that the statement on the deed was not intended to display the "contents [as if they] were necessarily then already true, but for use at closing." He maintains that there was insufficient evidence from which a jury could reasonably conclude that the statement (even if false) was made for the purpose of influencing the actions of Royal Bank. We agree.

On April 15, 1988, Juan Vicens, the vice president of Royal Bank, received a phone call from Colón requesting a $500,000 one-year loan. Colón offered a mortgage note on the farm as collateral for the loan. In a follow-up letter from Colón on April 18, Colón confirmed that he had requested the loan, "[o]ffering you as collateral a first mortgage note corresponding to a four

hundred sixty-three point nine eight one seven 'cuerda' property. . . . Should the loan be approved as I expect, I will deliver the promissory note for seven hundred thousand dollars as collateral at the time of signing." The next day, April 19, Colón registered a mortgage deed on the farm granting Royal Bank a first mortgage on the property. However, in the financing statement prepared by Colón's certified public accountant, and dated April 27, the Usera family's pre-existing mortgage was fully disclosed. The financing statement was submitted to Royal Bank as part of Colón's loan application. On May 3, 1998, Vicens prepared a letter to the Bank's credit department, recommending approval of the loan. In the letter, Vicens stated that Colón requested the loan "for the purposes of paying a debt which resulted from the purchase of property offered as collateral." The loan was approved on May 4. On May 13, Colón satisfied his obligations to the Usera family and the Usera family released their own first mortgage on the property. Three days later, on May 16, Colón signed the pledge contract at Royal Bank and obtained a check for the net amount of the $500,000 loan.

At trial, Vicens testified that he did not recall Colón telling him that the Usera's had a pre-existing mortgage on the property, but he specifically noted that "to me the important thing was that the day the loan was to be executed, that the property have the rank of a first mortgage." Colón fully disclosed the presence of the pre-existing mortgage in the financing statement. As Vicens testified on cross-examination, although he did not recall Colón informing him of the pre-existing mortgage verbally, "it's clear from this document that [the pre-existing mortgage] is mentioned on the financial statement." He further explained that the bank relies

Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan [is guilty of making a false entry].

on the financing statement to make decisions regarding the disbursement of monies and that they are critical in determining the creditworthiness of the individual. Moreover, in the actual letter recommending that the bank approve the loan, Vicens clearly stated that Colón needed the loan to pay off debt on the property that would be serving as collateral for the $500,000 loan.

Under these circumstances, no reasonable jury could find that the statement in the mortgage deed that Royal Bank had a first mortgage on the property was made for the purpose of influencing the bank to disburse a loan that the bank would not have otherwise made. To the contrary, that mortgage deed was filed in the public registry in anticipation of a loan closing with Royal Bank where Royal Bank would receive a first mortgage on the registry. Colón's loan application to the bank fully disclosed the presence of the Usera mortgage which would have to be discharged before Royal Bank obtained its first mortgage.

### F. Conspiracy (Count One)

When charging conspiracy under 18 U.S.C. § 371, the government must prove that "the particular defendant and at least one other person expressly or tacitly agreed to commit a federal offense." *United States v. Josleyn*, 99 F.3d 1182, 1190 (1st Cir.1996). Further, the government must show that the defendant voluntarily participated in the conspiracy and that an overt act took place in furtherance of the conspiracy. *Blasini–Lluberas*, 169 F.3d at 67. The defendant need not be familiar with "all the details of the conspiracy," *Josleyn*, 99 F.3d at 1190, nor must the government prove the conspiratorial agreement or the defendant's participation in the agreement by direct evidence. *See Blasini–Lluberas*, 169 F.3d at 67.

Colón argues on appeal that we cannot affirm his conviction on the conspiracy count because the only evidence that connected him to the loan to Consuelo García–Gomez was the handwritten notation by Blasini that the loan had been "discussed and agreed to by attorney R.L. Colón." Because this notation was allegedly written at a date following the actual transaction, the jury could not have concluded that he was involved in this transaction. For many of the reasons already stated, we disagree.

Contrary to Colón's contentions, the jury was not required to divorce the transaction with Consuelo García–Gomez from Colón's transactions with the other members of the Usera family. Although we concluded that there was insufficient evidence to establish the criminality of those other transactions, we also noted that Colón and Blasini were "playing it close to the line" in those dealings. *Blasini–Lluberas*, 169 F.3d at 67. Colón's personal involvement in those transactions adds considerable significance to the notation "discussed and agreed to by attorney R.L. Colón," permitting a reasonable jury to conclude that Colón and Blasini, already working together on the prior transactions, had agreed to use bank funds to enable Colón to satisfy his delinquent debt to Consuelo García–Gomez in violation of federal law, and that Colón and Blasini committed overt acts in furtherance of the conspiracy. Despite Colón's protests, it was for the jury to evaluate the importance of the notation on the loan document, regardless of the date that the notation was made, and all of the other evidence of Colón's collaboration with Blasini. We affirm the conspiracy conviction.

### IV. Forfeiture (Count Twelve) and the Ex Post Facto Clause

Count Twelve of the indictment alleged that the farm was subject to forfeiture pursuant to 18 U.S.C. § 982(a)(2)(A).[25]

---

**25.** The statute provides in pertinent part:

The court, in imposing sentence on a person convicted of a violation of, or conspira-

Colón argues that the Ex Post Facto Clause, U.S. Const. art. I, § 9, cl. 3, which prohibits the application of a law in a criminal proceeding where it would inflict "a greater punishment, than the law annexed to the crime when committed," *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798), barred the forfeiture of the farm because at the time the alleged crimes were committed, the statute did not allow for forfeiture as a penalty for the pertinent banking provisions.

On August 9, 1989, 18 U.S.C. § 982 was amended to add certain banking offenses (or conspiracy to commit such offenses) to the list of possible grounds for a criminal forfeiture. *See* Pub.L. No. 101–73, § 963(c)(1), 103 Stat. 183, 504–05 (1989). Among the provisions newly included as grounds for forfeiture were §§ 657, 1006, 1014, and 1344, violations of which were alleged in the indictment as the object of the Count One conspiracy. *See id.* In this case, although the indictment alleged that most of the overt acts committed in furtherance of the conspiracy were committed prior to August 9, 1989, it did include an allegation concerning events occurring in August of 1990. On the basis of the 1990 acts, the government included a count under the criminal forfeiture statute to take possession of the farm.

In order to resolve the Ex Post Facto issue we must determine the scope of the conspiracy between Colón and Blasini established by the evidence, "for it is that which determines both the duration of the conspiracy and whether the act relied on is an overt act which may be properly regarded as in furtherance of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). The government must "prove that the conspiracy, as contemplated in the agreement as finally formulated, was still in existence on [the relevant date] and that

cy to violate—
(A) section ... 657 ... 1006 ... 1014 ... or 1344 of this title affecting a financial institution shall order that the person forfeit to the United States any property constitut-

at least one overt act in furtherance of the conspiracy was performed after that date." *Id.* at 396, 77 S.Ct. 963.

The government described the object of the conspiracy in Count I as follows:

It was the object of the conspiracy that the defendants and coconspirators, and others to this Grand Jury known and unknown, would misapply or cause to be misapplied funds entrusted to or in the custody of the Ponce Federal Bank, F.S.B., by means of false statements, representations and pretenses, to Ponce Federal Bank, F.S.B. and the Royal Bank de Puerto Rico, for the purpose of permitting Ramiro L. Colón Muñoz and his wife to purchase and ultimately pay, a farm known as "La Esmeralda Número Uno" with loans obtained from the Ponce Federal Bank, F.S.B., and the Royal Bank de Puerto Rico.

The government cites two overt acts "whose close interrelation extended the conspiracy beyond August 9, 1989, thus excepting the instant case from the application of the *Ex Post Facto* [C]lause." Those overt acts are:

9. On May 16, 1988, Ramiro L. Colón–Muñoz obtained a loan for Five Hundred Thousand Dollars ($500,000.00) from Royal Bank de Puerto Rico, using "La Esmeralda" as collateral, a loan which he eventually paid off with funds belonging to Ponce Federal Bank, F.S.B.

10. On August 10, 1990, Ramiro L. Colón–Muñoz paid to the Royal Bank de Puerto Rico approximately Three Hundred Eighty–Nine Thousand Seven–Hundred [sic] Thirty Dollars and Seventy–Six Cents ($389,730.76) by means of wire transfer in order to cancel the balance due on the Five Hundred Thousand Dollars ($500,000.00) loan from Royal Bank de Puerto Rico.

ing, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.
18 U.S.C. § 982(a)(2).

Although the May 16, 1988 loan from Royal Bank was obtained prior to enactment of the forfeiture provision on August 9, 1989, the government argues that repayment of that loan on August 10, 1990, subsequent to enactment of the forfeiture provision, justifies the application of that provision. We disagree.

The evidence on the conspiratorial agreement between Colón and Blasini was largely circumstantial, involving evidence of the Ponce Bank transactions with the members of the Usera family in which Colón and Blasini participated together. That evidence proves a conspiracy between Colón and Blasini to misapply Ponce Federal Bank's funds in satisfaction of Colón's debt to Consuelo García–Gomez' for the purchase of La Esmeralda. The goal of this conspiracy was realized on May 13, 1988 when Colón paid his indebtedness to the members of the Usera family, including Consuelo García–Gomez, partly with overdrafts on his personal account at the Ponce Bank, and obtained a release of their mortgage on the farm. There is no evidence that the repayment of the Royal Bank loan on August 10, 1990 was an overt act in furtherance of the conspiracy between Colón and Blasini.[26]

■ A conspiracy does not continue indefinitely simply because the fruits of the conspiratorial objective continue into the future. *See United States v. Doherty*, 867 F.2d 47, 61 (1st Cir.1989) (holding that continuing salary payments for officers who received promotions (the object of the conspiracy) did not extend the conspiracy

because salary payments, without more, are best understood as the "result" of the conspiracy). As the Supreme Court has noted:

> Though the result of a conspiracy may be continuing, the conspiracy itself does not thereby become a continuing one. Continuity of action to produce the unlawful result, or ... continuous cooperation of the coconspirators to keep it up, is necessary.

*Fiswick v. United States*, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946) (internal quotation marks omitted). Colón's repayment of his Royal Bank loan is analogous to the continued receipt of increased salary as the result of the fraudulently obtained promotions at issue in Doherty. Where "the payoff [of a conspiracy] merely consists of ... ordinary, typically noncriminal, unilateral actions, ... *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues." *Doherty*, 867 F.2d at 61.

Although the government alleges that payments made after August 9, 1989 "were the last stages through which [Colón] attempted to fulfill the object of the conspiracy to ultimately pay for a farm known as 'La Esmeralda,'" this statement defines the conspiracy more broadly than the evidence can sustain. There is no allegation that Colón's repayment of the Royal Bank loan was itself illegal or that it involved the type of concerted activity through which

---

**26.** The government apparently contends that the Royal Bank loan of $500,000 on May 16, 1988 was an overt act in furtherance of the conspiracy between Colón and Blasini to use Ponce Bank funds to allow Colón to purchase La Esmeralda. In the government's view, the imminence of that Royal Bank loan on May 16 allowed Colón to incur briefly on May 13 the overdraft in his account when he issued checks to the Useras. That may be true. Nevertheless, the repayment of the Royal Bank loan in 1990 did nothing to further Colón's purchase of the property from the Useras. That transaction was completed in

1988. Also, the only involvement of Blasini in events subsequent to May 13, 1988 was his attendance at a Ponce board meeting in 1990 where the $615,500 severance package to Colón was approved. This money allowed Colón to pay off his debt to Royal Bank. Although the government introduced evidence pertaining to the severance package, and its retraction by the board after its issuance, the government never charged any illegal activity relating to the severance package, and Blasini's role in the meeting was not the subject of any testimony.

conspiracies pose "special societal dangers." *See id.* The government's theory of the case would encompass any subsequent re-financing of Colón's payment for La Esmeralda, however legitimate, as furthering the conspiracy. To the extent that Colón continued in his efforts to complete payment on the loan he had received from Royal Bank and did so on August 10, 1990, those were his acts alone and not part of the conspiracy with Blasini to use Ponce Bank funds to purchase La Esmeralda. The application of forfeiture to the farm on the basis of the conspiracy charged in Count One of the indictment violates the Ex Post Facto Clause of the Constitution.

## V. Evidentiary Objections

Colón claims that two evidentiary rulings at trial denied him a fair trial and warrant a reversal of the convictions and a new trial. We disagree.

 At trial, the government introduced evidence that the Board of Directors of Ponce Federal Bank unanimously awarded Colón a $615,500 retirement package in 1990. Bank officials further testified that, seven months after he was awarded the severance package, Colón agreed to return the monies to Ponce Federal Bank for undisclosed reasons, and he pledged La Esmeralda as a guarantee for the return of the severance package (on which interest was still due at the time of trial). That is the extent of the severance pay evidence. There was no testimony relating to the legality or appropriateness *vel non* of the severance package, other than evidence that the bank's legal counsel had approved it.

 Colón claims that the evidence was irrelevant and that, even if relevant, it was unfairly prejudicial. The government argues that this evidence was probative of an overt act in furtherance of the conspiracy—Colón's re-payment of his debt to Royal Bank in August 1990. We have rejected this theory of the conspiracy, discussed supra. Given that the conspiracy did not

extend to the repayment of the Royal Bank loan in August 1990, we cannot accept the proposition that evidence of his severance package and its return was relevant to proving the existence of the conspiracy. However, we conclude that any error in the introduction of this evidence was harmless.

 In reviewing for harmless error, we "ask whether the result would have been the same if the disputed evidence had not been admitted. We have therefore said that a conviction will be upheld if it is 'highly probable' that the result would have been the same." *United States v. Vigneau,* 187 F.3d 82, 85–86 (1st Cir.1999) (quoting *United States v. Cudlitz,* 72 F.3d 992, 999–1000 (1st Cir.1996)). The severance package evidence was remote in time from the other charges, ambiguous, and briefly stated. The Useras were paid in May 1988; Colón's retirement and the severance package events did not transpire until August 1990. The testimony on the severance package did not establish any wrongdoing on Colón's part. It did not relate factually to any of the convictions we affirm. We are convinced, therefore, that it is highly probable that the results in this trial would have been the same without the admission of the disputed evidence and we hold that its admission was harmless.

 Colón's second objection concerns the introduction of evidence of Blasini's apparent attempt to influence a witness prior to trial. During the government's rebuttal case, Marisel Marrero testified that Blasini approached her prior to trial and suggested that she might not recall the events at issue because they occurred so long in the past. The evidence was admitted as rebuttal evidence to refute Blasini's character evidence. Before the evidence was put before the jury, the court told the jury that it was not to consider Marrero's testimony "in any manner" as to Colón. In its final instructions to the jury, the court again informed the jury that it was not

to consider this testimony in evaluating the government's case against Colón. Although Colón argues that the introduction of this evidence was unfairly prejudicial, any risk of prejudice was cured by the court's limiting instruction. "We must presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case, and that they follow those instructions." *United States v. Smith*, 145 F.3d 458, 462 (1st Cir.1998) (internal quotation marks omitted). The court carefully instructed the jury on two occasions that it was not to consider the evidence about Blasini's dealings with Marrero against Colón. The admission of this evidence did not deny Colón a fair trial.

## VI. Conclusion

Although Colón challenges the court's enhancement of his sentence for his "leadership role," we do not address that argument because resentencing will be required in light of our disposition of this appeal. In summary, that disposition is the following:

The judgment is **AFFIRMED** on counts One, Six, Seven, Eight and Nine; **VACATED** on counts Two through Five, Eleven and Twelve. Upon remand, the district court shall enter a judgment of acquittal on counts Two through Five, Eleven and Twelve and shall re-sentence on the remaining convictions in light of this decision.